C. P. HALVER, Appellee, v. HIGGINS SHEEP COMMISSION COM-
PANY et al., Appellants.

**REFORMATION OF INSTRUMENTS:** Belated Claim of Mistake.
1  One who, without complaint, accepts delivery of property under
a written contract as then written, with full knowledge that
such contract does not contain a certain guaranty, may not,
when called on for payment, ask for a reformation of the con-
tract, on the plea that said guaranty was inadvertently omitted
from the contract, and especially when his failure to pay for
the property at the time of acceptance, as provided in the con-
tract, was an act of bad faith. Evidence reviewed in extenso,
and held insufficient to justify reformation for mistake.

WEAVER, C. J., dissents as to the facts shown by the record.

**APPEAL AND ERROR:** Review, Scope of—Belated and Inconsis-
2  tent Theory on Appeal. One may not plead and try his case on
the theory that an agent had authority to enter into a certain
contract, and, on appeal, question such authority.

*Appeal from Woodbury District Court.*—GEORGE JEPSON,
Judge.

MARCH 17, 1920.

ACTION on a written contract, to recover the agreed
purchase price of certain lambs delivered by the plaintiff to
the defendant, pursuant to such contract. The answer of
the defendant admitted the execution of the contract, but
averred that the contract itself did not express the real
agreement of the parties, in that the same should have con-
tained an undertaking and guaranty on the part of the
plaintiff of the weights of the lambs to be delivered, and
that such provision was omitted by oversight, and that the
same should now be reformed. Defendant avers a breach
of the terms of the contract, as thus reformed. It prays a
reformation and a judgment on counterclaim or cross-bill.
The cause was tried in equity. The district court entered

a decree for the plaintiff, substantially as prayed, and dismissed the cross-bill. The defendant has appealed.—*Affirmed.*

*E. A. Burgess* and *Fred H. Free,* for appellants.

*Henderson, Fribourg & Hatfield,* for appellee.

EVANS, J.—I. The defendant Joshua W. Higgins operates under the trade name of Higgins Sheep Commission Company, and is engaged in the business indicated by such trade name, in Sioux City. The plaintiff

1. REFORMATION OF INSTRUMENTS: belated claim of mistake.

is a real estate man, engaged also in the business of buying and selling sheep. He was a resident of Flandreau, South Dakota.

The contract sued on was one of two contracts, made at the same time, and pursuant to the same negotiations. They are both identical in all their terms, except that one called for a delivery of 2,200 lambs on September 1, 1916, and the other called for a delivery of 2,500 lambs, on September 25, 1916. Under the first contract, known in this record as Exhibit 13, the lambs were delivered on September 1st, and paid for. Under the other contract, the lambs were delivered on September 25th, but were not paid for. Plaintiff's suit is predicated upon this contract, known in this record as Exhibit A.

The defendant's cross-bill, however, treats both contracts as one, and asks to reform them both, and for relief under them, as so reformed. The general nature of defendant's contention is that the plaintiff agreed to guarantee a general average weight of all the lambs at 50 pounds, and a considerable percentage thereof at 60 pounds. This contention is denied by the plaintiff. If the defendant's contention at this point is sustained by the record, he is entitled to the reformation prayed, and to the consequent relief. If defendant is not entitled to such reformation, the

plaintiff is entitled to recover, in accord with the strict terms of the contract sued on. Exhibit A is as follows:

"This is to certify that I, C. P. Halver, of Flandreau, S. D., have this 25th day of August, 1916, bargained, sold and agree to deliver to Higgins Sheep Com. Co., the following described live stock at time, place, prices and under the conditions mentioned and described below.

"I guarantee the title to the live stock which I have sold under this agreement, and guarantee the stock when delivered will be in a merchantable, marketable condition, free from any and all infectious or contagious diseases, which guarantees state and Federal inspection.

"In consideration of and to complete this contract, I hereby acknowledge the receipt of $625 as an advance payment, the balance to be due and payable upon the complete delivery of the stock and fulfillment of this contract.

"Description of Live Stock Sold.

| No. Head | Description | Price | Time & Place of Delivery |
|----------|-------------|-------|--------------------------|
| 2,500 | Lambs | $4.90 per Head | F. O. B. Cars Sept. 25, 1916, Hettinger and Griffin, N. D. In proportion to total number loaded at both places. These lambs not to be sorted, or topped out for mutton. |

(Signed)   C. S. Halver."

We need not set out Exhibit 13, which is identical, except as to number of lambs (2,200) and date of delivery (September 1st). The negotiations which resulted in these contracts began on the morning of August 19th, and continued up to the time of their consummation, August 25th. One week later, delivery was made, under Exhibit 13. These

negotiations were initiated by certain telegrams, as follows:

"Exhibit 3.
"Lemmon, S. D., Aug. 17, 1916.
"Higgins Sheep Com. Co., Sioux City, Iowa:
"Wire offer on four thousand to be weighed at Griffin Oct. 1st. Nothing under fifty pounds. To average sixty pounds or better. Halver."

"Exhibit 6.
"Sioux City, August 18, 1916.
"Halver, Sheep Man, Lemmon, S. D.:
"What will you contract four thousand lambs average sixty Griffin October first delivery. Higgins."

"Exhibit 5.
"Sioux City, August 18, 1916.
"Wire me at once how much per hundred you will pay me for twenty-five hundred to four thousand head delivered at Griffin or Hettinger October first to weigh average sixty pounds. Wire me your best offer as I have two offers now and will sell at the highest price this afternoon. Will sell by weight or head. C. P. Halver."

"Exhibit 4.
"Sioux City, Iowa, August 18, 1916.
"C. P. Halver, Sheep Man, Lemmon, S. D.:
"My man Baker leaves for Lemmon tonight. Will try buy your stuff. Higgins Sheep Com. Co."

Pursuant to the last telegram, W. M. Baker, employee of the defendant, arrived at Lemmon, South Dakota, August 19th, and started upon an inspection of the lambs owned by plaintiff, under executory contracts for future delivery; and such inspection continued for a period of 5 days. Baker was a man of 17 years' experience in the business. Halver was the owner of 18,000 or 20,000 lambs, in the sense

that he had entered into contracts of purchase to that ex-
tent with sheep owners, who were to deliver to him on Sep-
tember 1st and September 25th. The lambs thus contracted
for were still in the custody of their original owners, and
could be inspected in the separate flocks, respectively, of
such original owners. There was a large number of these
flocks, covering an extended territory in both South and
North Dakota. · The parties traveled by automobile from
one flock to another, and Baker went through each flock,
for the purpose of forming a judgment as to the quality and ·
value of the lambs therein. One V. E. Baker also made the
same trip with the parties, and conducted an inspection in
his own behalf, as purchaser of the ewes of the same flocks.
To avoid confusion, we shall use the initials of V. E. Baker,
whenever reference to him is made. When initials are not
used with the name Baker, reference will be had to W. M.
Baker, the agent of the defendant herein. Baker complet-
ed his inspection August 23d, and the parties returned the
same evening to Lemmon, South Dakota. In the mean-
time, he had sent to his principal one or more telegrams.
On the morning of August 24th, he mailed to his principal
the following letter, known in this record as Exhibit F.

"Lemmon, So. Dak., Aug. 24, 1916.

"Higgins Sheep Co. Co., Sioux City, Iowa,

"Dear Sir: I got into Lemmon Saturday afternoon and
saw C. P. Halver. He and Halsted are the same. Halver
lives at Flandreau, S. D., and has bought up a lot of lambs
and ewes out here.

"I went out of here Sat. afternoon and we covered a
large country south and west. He showed me a lot of ·
lambs. I was not in reach of a wire until Wed. morning
when I phoned a message to Lemmon for you from Bison.
Reached Hettinger Wednesday afternoon and drove here
last night; will go back to Hettinger this morning; will
wait to hear from you there. Halver has around 25,000

lambs and sheep bought. As near as I find out he has paid $4.00 to $4.50 per head for lambs and $4.25 for ewes. His lambs are to have about 50 culled out of each band, the owner keeping them. The bands run about 750 each. Some men not selling ewe lambs.

"He is going to cut out and keep 1,600 ewe lambs. But first, he is receiving at Griffin and Hettinger the 1st of Sept. After counting each man's flock, he will turn them all together, then cut out his ewe lambs at both places to make the 1,600. Then from what is left if he sells any to deliver F. O. B. he will cut ten each way through the chute until enough are cut out to make the count. Some of the bands at both places are good, some are not. There will be about 25 per cent fat I think, but they are not very heavy, would weigh 55 pounds on market. And if the sellers sort as he says, the feeders will run down to 38 or 40 pounds. He seems very set on $4.90 per head, which is too high as they would not pay out even if all fat at the weights. He wants 25 cents per head down. He has cut out the Sept. 10th shipment and will only ship Sept. 1st and 25th. He has bought from 50 to 350 old ewes from the different bands and is selling them at $4.75 to $5.25 per head. The ewes in some places have lots of needles and some of the lambs also.

"I don't think I would care to contract lambs or ewes from him at present the way he wants to handle them. You might be able to do better by being present shipping day and buy just certain bands then. He has a lot of this stuff sold around Flandreau. Moxon has ordered 1,000 lambs. Halver is looking for too big a profit. And I don't see any money in them except the chance to buy at shipping time and that is slim. I met Mr. Waite last night and this morning and he said as I had seen conditions he would not write. I will go to Hettinger today and wait there to hear from you. Yours truly, W. M. Baker."

On the same date, Baker received from his principal

the following telegram, known in the record as Exhibit 8:

"Sioux City, August 24th, 1916.

"Walter M. Baker, Hettinger, N. D.:

"I want those lambs and will buy them provided I can get you to answer my inquiry so that I can form a correct opinion of what I am getting. Wire me how many lambs are for sale, if they are South Dakota or Montanas, kind of wool, what the entire band will average there, how many deliveries, what dates, how many each delivery, what percentage are fat in the entire bunch, how light they will run down, what percentage will be light, what per cent will weigh over sixty, lowest price delivered on cars, how much needed on contract. Stay where you are until further notice. Give me quick action. Higgins Sheep Com. Co."

Baker answered this telegram with Exhibit 7, as follows:

"Lemmon, S. D., Aug. 24, 1916.

"Higgins Sheep Commission Co., Sioux City, Iowa:

"About seven cars Sept. first. Seven to ten Sept. twenty fifth. Twenty five per cent first shipment fat, forty of second, tail ends thirty five to forty lbs. Dakota sheep, Cotswold, half Ramboulia. Average fifty lbs. Fifteen per cent sixty lbs. Rate Sioux City forty cents. Wire ans. Hettinger. See letter. W. M. Baker."

On the following day, Baker received from his principal the following telegram, known as Exhibit 15:

"Sioux City, August 25th, 1916.

"Walter M. Baker, Hettinger, N. D.

"If those lambs clean from burrs, needles or culls thrifty and all can be bought at price named deliveries as stated written contract describing the lambs by brand fully identified with twenty-five to fifty cents per head paid down balance on delivery on cars agreeing now just how many there will be, not so many cars but so many head of lambs

buying even carloads, close the deal but make the best trade for me that you can. The market is lower on feeders expect you to buy them for less. Let me know what you do by wire follow by letter. Stay where you are for further advice.    Higgins Sheep Commission Co."

The contracts in suit were entered into on the evening of that date.   Exhibit 8 was shown by Baker to Halver. Halver participated in formulating Exhibit 7, said telegram being in his handwriting, except the words, "See letter."   Baker testified that Halver agreed to guarantee the estimates appearing in Exhibit 7, whereas Halver testified in denial of this, and that these estimates were those of Baker, who had expert knowledge and judgment on the subject; that all these estimates had been incorporated by Baker in a lengthy telegram, just previously written by Baker, and that Exhibit 7 was a condensation of such lengthy telegram.

The conflict of evidence between these two witnesses at this point presents the crux of the case.   In order to weigh the relative credibility of these conflicting witnesses, reference must be had to the circumstances antecedent to the contract, and to the conduct of the parties thereafter. Corroboration is claimed for Baker as follows:  (1) In the telegram which initiated the negotiations.   (2) In the fact that Exhibit 7 was written by Halver.   (3) In the fact that, immediately after the signing of the contract, Baker wrote a letter to his principal, advising him that Halver had made such guaranty, which guaranty had been omitted by oversight from the contract.

We will not enumerate at this point affirmative corroboration claimed for the plaintiff, but will refer to the same later in the discussion.

As to the initial telegrams, it is clear, in the light of the whole record, that they sustain little relation to the con-

tract actually entered into. Halver's two telegrams called for an offer by wire, to be based upon weights. "Wire me at once how much *per hundred* you will pay," said Exhibit 5. "Wire offer on 4,000 *to be weighed* at Griffin," said Exhibit 3. Higgins wired no offer. He simply sent Baker upon the ground. Exhibit 5 also offered to sell by "weight or head." It is undisputed that there was no proposition considered between Baker and Halver of a sale by weight. Halver made a price to Baker of $4.90 per head, and Baker went out on his tour of inspection with such proposition before him. It is not claimed that Baker ever made an offer, pursuant to the request of either of the initial telegrams. The price was made, not by Baker, but by Halver, at so much per head. The purpose of the inspection by Baker was to determine whether the identical sheep thus offered were worth the price. Of course, in the selection of a given number out of a larger number, a plan of selection, for the purpose of maintaining equality of average between those taken and those left, was involved. We see, therefore, little significance to be attached to the initial telegrams, as in any sense controlling the rights of the parties under the contract actually made.

As to the telegram, Exhibit 7, Halver is charged with notice of its contents, so far as material. The fact that he acted as a scribe in the writing of it has no other effect than this, there being no charge of fraud or collusion, as between him and Baker. There is no suggestion of guaranty in this telegram. There was none in telegram Exhibit 8, sent by Higgins. There was none in the letter, Exhibit F, written by Baker to Higgins, to which reference is made in the telegram, and of the contents of which Halver knew nothing. Exhibit 7 represented the actual opinion of Baker at the time. This opinion was based upon his inspection. His experience was much greater than that of Halver. Baker understood that. He testified:

"We went from band to band. At times, he described what he thought they would weigh, and told me there would be so many that could go to market as butcher stuff. That did not interest me, as I was to judge for myself what they were."

As we shall presently see, the recitals of Baker's letter, Exhibit F, have an important bearing at this point, and we pass it for the moment. Corroboration is claimed also for Baker in the alleged letter which he wrote to his principal on August 25, 1916, immediately after entering into the contract. The genuineness of this letter is challenged by the appellee, and we shall deal with that phase of the discussion in a later paragraph. This letter is known in the record as Exhibit 25. Baker states therein that Halver was to guarantee the quality and weight, but that this was omitted from the contract through his forgetfulness.

The defendant put in evidence, also, a letter known as Exhibit 11, purporting to have been written by him to Halver on September 5, 1916, after the receipt of the first shipment. The purport of this letter was, in effect, a rejection of the lambs received in the first shipment, as not being in compliance with the contract. No reply to this letter was received by him from Halver. This letter is challenged by the plaintiff as spurious, and as being no part of any actual correspondence. We shall deal with this feature in a later paragraph. The foregoing presents the salient features of defendant's case, so far as it relates to his right of reformation on the cross-bill. We may as well set forth here Exhibit C, being the letter by Higgins to Halver on September 21st, pertaining to the delivery to be made on September 25th, to which letter reference must be made in the later discussion. It was as follows:

"Sioux City, Iowa, Sept. 21, 1916.

"Mr. C. P. Halver, Hettinger, N. D.

"Dear Sir: We wired you in response to your telegram saying that our Mr. Baker would leave tonight and meet you at Hettinger. He will also desire *to see and accept the lambs* purchased on contract. Your wire to us of August 18th offered 2,500 to 4,000 lambs delivered Hettinger or Griffin, average 60 pounds, was the lambs under consideration when we sent Mr. Baker there at that time the purchase was made. Those already shipped do not come up to this average. Mr. Baker advised that owing to the railroad difficulty and congested conditions he received some lambs that he otherwise would not have done under normal conditions. We therefore expect the balance to be up to the understanding, and if you have more of the same kind as per your telegram of this morning we shall be in the market to buy them.

"Very respectfully yours,

"Higgins Sheep Commission Co.,

"JWH.M                        Per J. W. Higgins."

With the foregoing exhibits before us, we may proceed to the discussion of the relative weight of evidence on the merits of the controversy.

II. Exhibit F is of prime significance. It represents Baker"s understanding, at that time, of Halver's proposition, and his judgment of the quality and weights of the sheep which Halver proposed to sell. There is no suggestion in it of a guaranty by Halver. On the contrary, it negatives any suggestion of guarantee. The method of selection is specified in the letter:

"Then from what is left if he sells any to deliver F. O. B. he will *cut ten each way through the chute until enough are cut out to make the count.*"

From the foregoing, it is evident that the best sheep were not to be culled out for the purpose of this sale. If

Halver stood as a guarantor of the weights, there would be no occasion for the method of selection here pointed out. On the contrary, it would devolve upon Halver to make a selection at his own risk, which should comply with the guarantee. The purpose of the method here pointed out was to maintain the average of the flock, as between those sold and those left unsold. The lambs from the different flocks which had been inspected by Baker were to be delivered by their then owners to Halver on September 1st. The flocks were then to be mixed, and then the selection made, "ten each way through the chute." Suppose, for instance, that a sale had been made by wire on August 18th, pursuant to the initial telegrams of Halver, and by offer and acceptance based thereon, it would have devolved upon Halver to make his own selections, at his own peril, for the purpose of delivery under such contract.

This letter is wholly consistent with the contract as actually entered into on the evening of the following day, and is strictly corroborative of the correctness of such contract, as executed, unless it shall appear that, after the writing of the letter, and before the signing of the contract, some change was made in the proposition under consideration. After Baker received Exhibit 15, the final telegram from Higgins, he endeavored to get the price reduced, and offered $4.75 per head. This offer was rejected by Halver. There is no dispute about this. Baker testified that, just before the contracts were entered into, Halver agreed to guarantee the weights, according to the telegram, Exhibit 7. The credibility of this particular testimony and its circumstances will be considered in a later paragraph. Sufficient to say, at this point, that we find that there was no change made in the proposition of Halver, as outlined in Exhibit F by Baker. The contracts, as drawn, provided for delivery F. O. B. *at Griffin and Hettinger.* There is no dispute about this feature. If Halver were to guarantee

weights, these would be the weights at time and place of delivery. The contract was drawn by Baker, upon blank forms furnished by his principal. The contract, as drawn, contemplated a qualified guaranty. The subject of guaranty was not forgotten. The contract expressly declares a guaranty and qualifications thereof. This is a strong circumstance, of itself, to negative the claim of forgetfulness on the subject of guaranty. Baker testified that he discovered the omission from the contract, the same evening that the contracts were made. He admits that he did not mention the subject to Halver. He was with Halver constantly, for two days thereafter. Nor did he, during that time, mention the subject of mistake in the contract. No plausible explanation is offered of his failure in this regard. After three or four days' absence, Baker returned to receive the delivery, on September 1st. He did receive the delivery. He testified that the method of selection agreed on was the same as stated in Exhibit F. This was the method actually followed in the selection, except that a larger number was substituted for the number "10," for the purpose of more rapid work. It is virtually undisputed that Baker received his allotment from the identical bands of sheep which he had inspected. V. E. Baker, the purchaser of the ewes, was present, and took delivery at the same time of the ewes from which the lambs were separated. The lambs being loaded, the delivery by Halver was complete. Baker so recognized it, and paid for the lambs at $4.90 per head, in strict accord with the terms of the contract. Nor was there anything said, up to this time, about any mistake in the contract, or about any guaranty of weights. Six hundred forty of the lambs were billed to Canton, and the remainder to Sioux City, where they arrived on September 4th or 5th. The lambs were not weighed at the time of delivery, nor were they weighed on arrival at Sioux City. The only evidence we have of actual weights

of these lambs is the estimate of witnesses who saw them. No reason appears upon this record why we should deem the estimate of their weights in Sioux City as any more reliable than the estimates made by Baker before they were shipped. They necessarily suffered shrinkage in weight, as well as loss of quality, in the long shipment. The day of their shipment was the day of their weaning, and they could not be expected to thrive greatly, during the ensuing three or four days. The delivery was F. O. B. Hettinger and Griffin. Deterioration and shrinkage were inevitable, as the defendant well knew. Though we were to find that there was a guaranty of weights, yet the burden would be on the defendant to prove the deficiency of weights at Hettinger and Griffin. The very fact, however, that their weights were not taken, either at the place of delivery or on arrival at Sioux City, indicates strongly the mutual understanding of the parties that no weighing was contemplated, under the contract.

On this branch of the case, therefore, we deem it clear that the conduct of Baker was wholly inconsistent with any claim of forgetfulness or mistake in the terms of the contract, and that his acceptance of delivery thereunder of the identical lambs contracted for by him was an affirmation of the contract as actually made, and that it is not now subject to reformation upon any ground known to the defendant prior to such acceptance. Needless to say that the delivery by plaintiff and the acceptance and payment by the defendant constituted a full execution of the contract by both parties.

III. Our foregoing conclusion finds further confirmation in the circumstances attending delivery and acceptance of the lambs under the second contract, being Exhibit A. The second delivery was to be made on September 25th. On September 21st, Higgins wrote to Halver the letter Exhibit C, hereinbefore set forth. This letter advised Halver

that Baker will "meet you at Hettinger. He will also desire *to see and accept* the lambs purchased on contract." The foregoing leaves no doubt of the authority of Baker "to see and to accept." He appeared at Hettinger on September 23d, and remained there until the cars were loaded, on September 25th. He was there when the bands of sheep were brought in. He saw the process of mixing the different bands. The same method of selection as before was adopted. Nor, up to this time, had he ever made any claim of mistake in the contract. . V. E. Baker was present at this time, also, to receive the ewes from which Baker's lambs were taken. There can be no question, under this record, as to the identity of the lambs delivered to Baker, as being the same as those he inspected. At this time, only one question of dispute arose. Baker claimed a cut-back on certain bands of sheep, because of long-tails and peewees, etc. By a cut-back is meant a rejection or setting aside of certain sheep, as not being included within the fair contemplation of the contract. Under the general practice of sheep raisers, the tails of lambs are cut off at shearing time. The "long-tailed" are lambs born after shearing time, and the "pee-wees" are the youngest of them. Baker claimed a cut-back of 225, and this was acceded to by Halver. The others were all accepted and loaded, to the number of 2,160. Three cars, comprising approximately 1,000 lambs, were billed under defendant's orders to Roscoe, South Dakota. The others were billed to the defendant at Sioux City. Though Baker accepted these lambs, he did not pay for them. He made the excuse that he had no check, and the further excuse that it was too late to get into the bank (as it was) ; and that, therefore, he could not draw a draft. He told Halver that the purchase price would be remitted to him from Sioux City. This conduct on the part of Baker was not in good faith, but was done pursuant to a ruse on the part of Higgins.

The shipment arrived at Sioux City on September 28th. When the Roscoe shipment arrived, does not appear. Two days before their arrival, Higgins departed for Montana, and did not return until the 5th of October. Before going, he left instructions with his clerk to have the lambs weighed when they arrived, and, if they averaged under 50 pounds, to refuse payment. The lambs were not weighed at Hettinger or Griffin. It does not appear that those shipped to Roscoe were weighed there. Baker testified that he saw the Sioux City consignment weighed on September 28th. He produced certain figures of weights. These figures show that 1,151 weighed 50,730 pounds, or an average of a little above 44 pounds. Pursuant to her instructions, Higgins' clerk refused payment. On October 5th, Halver had a conference with the defendant, and, on the same day, began this suit to recover on contract, Exhibit A. At no time prior to the beginning of the suit did Baker or Higgins claim to Halver that there was any mistake or oversight in the contract. Having obtained possession of these sheep from plaintiff, by purported acceptance thereof under the contract, and having avoided payment therefor by a mere ruse, is defendant entitled now to the aid of a court of equity to reform this contract, on a ground known to him since August 25th? He claims to have put himself in the attitude of a mere bailee, and to have rejected the shipment, and to have refused to receive it. But he *did* receive it at Hettinger and Griffin. Baker was his *alter ego,* sent there for that very purpose. By accepting delivery at the contract place of delivery, and causing the shipment of the lambs to Roscoe and to Sioux City, he put it out of the power of the plaintiff to produce evidence of the actual weights of these lambs, as they were at the time of delivery, or, for that matter, as they were thereafter. The delivery was a complete performance of the contract by Halver, according to its terms as actually made. If Higgins' claimed

there was a mistake in the contract which should be corrected, whereby the delivery thus made by Halver would not be a compliance with the contract as reformed, ordinary good faith required Higgins to say so in advance of his ruse. Even if his grounds of reformation were originally good, it would be inequitable to permit him to withhold them from the plaintiff while he was dispossessing him of the subject-matter by purported acceptance, and thereby putting it out of the plaintiff's power to produce material evidence on the new issues which would be made by reformation.

We are clear that the defendant could not accept these lambs in Hettinger and reject them in Sioux City or in Roscoe. He is not suing for damages for breach of warranty. He is, in effect, rescinding the contract by rejecting the subject-matter on the ground of noncompliance, and treating the same as a mere consignment to a bailee. Baker's act in selecting and receiving the lambs at Hettinger and consigning them to the four winds must be deemed as having some legal effect. It was either a rejection or an acceptance. It could not be both. It could not be neither. It was not a rejection. He then and there delivered to Halver a receipt for the same, as follows:

"Exhibit B.

"Received of C. P. Halver, 2,160 lambs at Griffin, Sept. 25, 1916.

"W. M. Baker,
"Of Higgins Sheep Com. Co.

"At $4.90."

This writing was not only a receipt for the lambs, it amounted, in legal effect, to a due bill. The amount due thereunder was a mere matter of computation: "2,160 lambs at $4.90." Halver could have based his present action upon this due bill alone. This, too, was a clear confirmation of the contract, as actually made. If action had

been brought upon this receipt, could the **defendant have** obtained a reformation of the original **contract upon** grounds known to him at the time, and before the receipt was given? The delivery of this receipt and the acceptance thereof by Halver necessarily passed the title and **right of** possession of the lambs to the defendant, and was as much an affirmative acceptance of the lambs under the contract by defendant as would have been the delivery of a check in payment of the purchase price; and this is so even if there had, in fact, been a guaranty, under which the defendant might have maintained an action for damages. Whatever the right of defendant would have been under the guaranty, if one were proved, it would not have been a right to disaffirm the contract or to reject the delivery, once accepted, with full knowledge at the time of every fact which he claims to know now.

IV. Let it be supposed that the contract had been drawn so as to include the specifications of the telegram Exhibit 7 as a guaranty. This would have called for 15 per cent to average 60 pounds, and for the whole to average 50 pounds at Hettinger and Griffin. This is the reformation asked for by the cross-bill. 50 pounds weight at Hettinger would not be 50 pounds weight at Sioux City or at Roscoe. When Higgins directed his clerk to reject the shipment, if it weighed less than an average of 50 pounds at Sioux City, he was directing a breach of the contract in advance, and setting up a standard for the guidance of his clerk to which he was not entitled, even under a reformed contract. The amount of shrinkage which such a shipment would suffer, under the circumstances attending this shipment, is uncertain under the evidence. Under the defendant's evidence, the shrinkage is estimated at from 2 pounds to 4 pounds per head. Under the plaintiff's evidence, it could have been 8 pounds. Those weighed at Sioux City were a little more than half of the number delivered. Whether those shipped

to Roscoe would have averaged more or less is a mere matter of estimate.

V. There are certain items of evidence in the record which involve the veracity of Higgins and Baker as witnesses. The defendant put in evidence the letter Exhibit 11, which purported to be written by himself, on September 5, 1916, to Halver. Higgins identified the letter, and testified to mailing the same. The letter is as follows:

"Sept. 5, 1916.

"Mr. C. P. Halver,

"Flandreau, S. D.

"Dear Sir: Referring to the lambs you have shipped on our contract will say that as a whole they do not come up to specifications, of course this consignment is only about 50 per cent of the whole and it depends to some extent upon what the balance are as to how many of these will go in on our contract, there is an extremely long light 'tail-end' many of which are culls and not thrifty, these I could not take at all, and I am not sure just how it would suit you best to have them handled.

"Therefore inasmuch as they are here and not salable as they are, and it will be very expensive to hold them in the yards here until the balance comes, I suggest buying some feed for them near here, dipping and putting them out where they will do the most good for themselves pending the arrival of the balance, then I can use what come within my contract and no doubt satisfactory disposition can be made of the rest or if preferable you can feed them for market yourself.

"Or if you prefer selling the light end at once we will handle them for you to the best advantage possible, advising however that just at present there is practically no demand for these extremely light cully stuff and they will sell very low.

"Kindly give this your prompt attention as if we are

to have any interest in the top end we want to know it without delay so we may place them on our orders and avoid unnecessary expense.

                    "Very respectfully yours,
"JWH                    Higgins Sheep Commission Co."

Defendant also put in evidence Exhibit 25, which purports to be a letter from Baker to the defendant, dated August 25th, and purporting to have been written immediately after the signing of the contracts. This letter was identified by Baker, and the mailing thereof testified to by him. This letter purported to be a report of the contracts entered into, and closed with the following paragraphs:

"Halver agreed and guaranteed to sell and deliver lambs according to description in message sent to you describing weights and condition and per cent of fats and tail ends. He agreed to have lambs of this sort, making them as described. I intended to put description in contract, but forgot same. I will get the message from agent at time of delivery."

Exhibit 15, which is a telegram from Higgins to Baker, was received by Baker just before the contracts were entered into. Baker testified that he showed this telegram to Halver before the purchase was made, and that it was at this time that Halver agreed to guarantee weights, and that, thereupon, the contracts were immediately drawn. This telegram has hereinbefore been set forth. The plaintiff contends that Exhibit 11 is a fabrication; that the same is true of Exhibit 25; and that the claim that Exhibit 15 was shown by Baker to plaintiff is manifestly and consciously false.

As to Exhibit 11, the purported letter of September 5th from Higgins to Halver, no such letter was ever received by Halver. Higgins did write a letter to Halver on September 5th, which was received, and which is in evidence. It is entirely silent on the matters appearing in Exhibit 11.

On September 6th, Halver was in Sioux City, and spent several hours with Higgins. They lunched together and talked business. Not a word was said by Higgins as to having sent the letter Exhibit 11. Halver testified that none of the complaints now appearing in Exhibit 11 were made orally to him. There was nothing said about a guaranty, and nothing said about rejecting the shipments. Higgins' only denial of this testimony is the following:

"No more was said to Halver than that there were a great many lambs in there that would not come within the contract."

And yet, according to his later attitude at the trial, he was, at that very time, holding the shipment as a rejected shipment, and holding the same at Halver's expense. He was also waiting for a reply to his alleged letter of the day before. He knew that Halver must have left home for Sioux City before such letter could have reached him by mail. Halver left him that day, entirely unconscious of friction or material dissatisfaction over the shipment. Higgins must have had in his possession at that time Baker's letter of August 25th, which is Exhibit 25, but he made no mention of it, or of any guaranty, or of any alleged mistake in the contract. On September 21st, Higgins did write to Halver the letter Exhibit C, hereinbefore set forth. This letter is quite inconsistent with the prior existence of Exhibit 11. Neither is there any suggestion here of any mistake in the contract, nor of any guaranty, except such as shall be implied from the first telegram of August 18th.

When Exhibit 11 was first put in evidence, the defendant testified that it had been dictated by him to his stenographer, and by him regularly mailed. On cross-examination, he was given until the next day to produce the stenographer's notes. Being recalled on the next day, he testified that the letter was not dictated to his stenographer, but

was written by himself.   The other letter written by him
to Halver on September 5th *was* dictated by him to his
stenographer.   It will be noted that Exhibit 11 is a some-
what lengthy letter, and one which a busy man would be
more likely to dictate to his regular stenographer than to
write himself; and this is especially so, in view of his hav-
ing kept a copy of it.   No explanation was attempted by
the witness as to any reason for the method adopted by
him.   It was upon this letter that the defendant, at the
trial, predicated his alleged rejection of the shipment, and
his holding the same as bailee, at the expense of Halver.
The burden was upon him to prove the genuineness of the
letter as a part of the actual correspondence.   The circum-
stances here indicated are too damaging to justify us in
holding that such burden was met.

Turning now to the letter from Baker of August 25th
to Higgins, being Exhibit 25, such letter, of course, what-
ever its contents, was not binding upon Halver.   The devel-
opments of the trial, however, might have rendered it ad-
missible as corroboration of Baker in his claim of mistake
in the contract.   From the nature of the case, the plaintiff
cannot prove the alleged spuriousness of this portion of
that letter by direct evidence.   Reliance is had upon the
circumstances.   If the letter written by Baker on August
25th, as a report of the purchase, contained this paragraph,
then Higgins knew of the alleged guaranty and the mis-
take in the contract immediately, and before receiving any
deliveries.   He never mentioned any mistake or guaranty
in any of the correspondence between him and Halver.   He
did not mention it in the visit of September 5th.   He com-
pletely ignored it in his letter of September 21st, wherein
he made claim under the telegram of August 18th.   The
conduct of Baker in ignoring the subject has already been
set forth, and need not be repeated.   This letter was pro-
duced at the last day of the trial.   All other correspondence

had been placed in the hands of defendant's attorneys, at the beginning of the litigation. This letter had not. It was alleged to have been kept in the defendant's safe, until the day of its production. The only explanation offered by the defendant of the circumstances here indicated was that he had no recollection of receiving the letter. This fact would, of course, explain his conduct. Is it not also very strong evidence that he never did receive it in this form? If he had received it, would he be likely to have forgotten information so important, in view of his alleged rejection of the first shipment? The ʲfurther circumstance appears that this letter, if written at all, was written at Lemmon, South Dakota, from the same hotel as the letter Exhibit F, which was written the day before. The letter produced was written upon the stationery of the Higgins Sheep Commission Company. In explanation of that, Baker testified that he always carried stationery. But the letter Exhibit F was written upon the stationery of the hotel at Lemmon. Halver testified to the circumstances of Baker's obtaining such hotel stationery, in that Baker then said to the landlady that he had no stationery with him. Halver's testimony as to this statement is not denied by Baker, nor is any explanation offered. When we find further, upon all the evidence in the case, that the statement contained in such paragraph was not, in fact, true, the improbability of its having been included in the letter is somewhat intensified. We think the circumstances here shown are too damaging to justify us in finding that the defendant has shown this letter to have been a part of the regular correspondence.

Baker testified that, before the close of the contracts, he disclosed to Halver the telegram Exhibit 15, hereinbefore set forth, and that it was then that Halver agreed to the guaranty. This is denied *in toto* by Halver. A perusal of Exhibit 15 contradicts the probability of such a course.

It was a strictly confidential telegram from Higgins to Baker. Its first sentence was:

"If those lambs clean from burrs, needles or culls thrifty and all can be bought *at price named* \* \* \* *close* *the deal* but make the *best trade for me that you can.* The market is lower on feeders *expect you to buy them for less.*"

To show this telegram to Halver was to advise him that Baker was under final instructions to pay him his price, unless he could do better. It is undisputed that Baker did make him a final offer of $4.75, which Halver rejected. It is significant, also, that this telegram indicated the specifications to be included in the contract. There was no reference therein to any guaranty. We think the improbability of the truth of Baker's testimony at this point is so great as to be quite conclusive corroboration of the testimony of Halver.

VI. The point is made in the briefs for appellant that, because Halver did know the contents of telegrams Exhibits 8 and 7, he was thereby aware of a limitation upon the authority of Baker, and that, in effect, he could not enter into a binding contract with him, in excess of such authority. It is enough to say, in that connection, that nothing is predicated, in answer or cross-bill, upon any alleged act on the part of the agent in excess of authority. There is not an averment on that subject. We have no occasion, therefore, to consider it. Enough has been said to indicate our reasons for the conclusion which we reach. The opinion is already of undue length. We have gone into the details of the evidence more than we would ordinarily, because, upon our first consideration of the case, some of us reached the conclusion that the defendant should prevail. We are satisfied, upon the whole record, that the trial court properly dismissed the cross-bill, and rendered judgment for plaintiff for the

2. APPEAL AND ERROR: review, scope of: belated and inconsistent theory on appeal.

value of "2,160 sheep at $4.90" each, in substantial accord with the terms of the receipt and due bill given by Baker on September 25th, at the time of the second delivery.—*Affirmed*.

LADD, GAYNOR, and STEVENS, JJ., concur.

WEAVER, C. J. (dissenting). I am unable to concur in the foregoing opinion. As I read the record, it does not sustain the views of the majority as to the contract made by the parties, by the terms of which their rights should be measured. I cannot agree that Exhibit A, or that such exhibit in connection with Exhibit 13, constitutes the entire undertaking of the respective parties, but rather, consider that the correspondence had between the parties, culminating in the execution of the exhibits named, is to be read with them in determining their nature and effect.

The plaintiff was the moving party in the negotiations, and, by tracing the correspondence in its chronological order, the point I am trying to make will be clear.

On August 17, 1916, plaintiff telegraphed to defendant, saying that he had 6,000 lambs for sale, and soliciting an order. To this, defendant at once responded by wire, asking:

"What do you want for 6,000 lambs? What are the deliveries, and at what point?"

On the same or following day, plaintiff telegraphed again:

"Wire offer on 4,000, to be weighed at Griffin, October 1. Nothing under 50 pounds. To average 60 pounds or better."

Still again, on the same day, plaintiff telegraphed once more:

"Wire me at once what you will pay me for 2,500 to 4,000 head delivered at Griffin or Hettinger October 1, to weigh average 60 pounds. Wire me your best offer as I

have two offers now and will sell at the highest price this afternoon will sell by weight or head."

At this point, defendant responded, saying:

"My man Baker leaves for Lemmon tonight. Will try to buy your sheep."

It was at this stage of the proceedings that Baker went to Dakota, as stated by the majority. After Baker had made more or less inspection of the flocks, and obtained an offer from plaintiff, he telegraphed to defendant, saying:

"Halver offers 7 cars lambs September 1st Hettinger and Griffin. Average 50 pounds one fourth fat balance good feeders. Ten cars Sept. 25. Some real good. Wire me today Hettinger. Last shipment guaranteed sixty."

To this message, the defendant answered:

"I want those lambs and will buy them providing I can get you to answer my inquiry so I can form a correct opinion of what I am getting. Wire me how many lambs are for sale; if they are South Dakotas or Montanas, kind of wool, what the entire band will average, what dates, how many each delivery, what percentage are fat in the entire bunch, how light will they run down, what percentage will be light, what percentage will weigh over sixty, lowest price delivered on cars, how much needed on the contract. Give me quick action."

When Baker received this message, he showed it to plaintiff, and plaintiff himself prepared and formulated the answer, as follows:

"About 7 cars Sept. 1. Seven to ten Sept. 25, 25 per cent. first shipment fat, 40 of second. Tail-ends 35 to 40 pounds. Dakota sheep. Cotswold, half Ramboulia. Average 50 pounds. 15 per cent 60 pounds."

This message, sent to defendant on August 24, was promptly answered by message to Baker, as follows:

"If those lambs clean from burrs, needles or culls, thrifty and all can be bought at price named, deliveries as

stated, written contract describing the lambs by brand fully identified with 25 to 50 cents per head paid down balance on delivery on cars, agreeing now just how many there will be, not so many cars but so many head of lambs, buying even carloads, close the deal but make the best trade for me you can."

Immediately on receipt of this dispatch, the so-called contracts, Exhibits A and 13, were made by plaintiff and Baker.

It will be seen that Baker's agency was strictly limited to buying the lambs described, on the terms which had been reported to the defendant, and that this limitation was fully known to the plaintiff; and it seems to me like shutting our eyes to the light, and ignoring the fundamental principles of the law of contracts, which exact fair and honest dealing between buyer and seller, to say that, in this transaction, plaintiff may deliver or tender to the defendant lambs of a quality and value distinctly inferior to those described in his offer of sale, and be allowed to recover therefor a price which had been fixed in consideration of his repeated assurance that the animals he was selling were of a superior and more valuable grade. The clause in defendant's final telegram, telling Baker to make the best deal he could for his principal, was written in connection with the specific limitations there placed upon his authority, and cannot fairly be construed as being more than a request to secure better terms, if he could; but it surely did not operate as authority to make a more unfavorable bargain than had been reported to the defendant. The plaintiff was in no manner deceived or misled. He had, from the outset, particularly described to defendant the kind and quality of lambs he professed to have for sale. That description, without material variation, was repeated at each step of the bargaining. He knew, also, that, when Baker had reported his offer to defendant, the latter had

again insisted on knowing the facts, before consummating the purchase, and he then, himself, in his own handwriting, wrote out the final telegram to defendant, again de scribing the lambs, their condition and weight; and it was only on receiving this information that defendant directed the purchase to be made.

Personally, I do not believe any reformation of the contract is required, to entitle defendant to avail himself of his defense, but think that it is entirely within the province of the court, even in an action at law, to say that the correspondence between the parties, culminating in the execution of Exhibits A and 13, should all be construed together, as containing the agreement between the parties.

The fact that Baker was present in Dakota, and assisted in receiving and shipping the lambs, is not material, for the reason already suggested: that he had no authority to buy the lambs, if they were not substantially such as had been described by the plaintiff; and defendant was, therefore, under no obligation to repudiate Baker's act, until it became known to him on the arrival of the shipment in Sioux City.

For the reasons stated, I am of the opinion that the judgment appealed from should be reversed.