JACOB KANOFSKY, Appellee, v. J. L. WOERDERHOFF, Appellant.

No. 40606.

MARCH 10, 1931.

*C. W. Meek,* for appellant.

*Wenner & Mosier,* for appellee.

KINDIG, J.—This litigation primarily involves the defendant-appellant's right to use, under a lease, a small heating plant in the rear basement of the three-story Century Building in Waterloo. It is claimed by the appellant that the lease grants him that portion of the basement which includes this heating plant. The lease, wherein Albert J. Warnke (appellee's grantor) was lessor, and the appellant lessee, describes the property demised as follows:

"The first floor (being the ground floor) *and approximately the rear sixty feet of the basement thereof* of the property commonly known and described as Number 611-13 Sycamore Street, the city of Waterloo, Black Hawk County, Iowa." (The italics are ours.)

On the one hand, appellant claims that the words "approximately the rear sixty feet" include the heating plant, which is located in the rear of the basement; while, on the other, the plaintiff-appellee urges that, in making the lease, the lessor, Albert J. Warnke, the then owner of the building, and appellant mistakenly failed to exclude the heating plant. Appellee's position is that the words "approximately sixty feet" did not mean exactly that distance, or, in any event, did not include the heating plant.

Said 60-foot space named in the lease, appellee argues, included a portion of the basement between a barber shop in the front of the basement and the heating plant in the rear thereof. Furthermore, it is appellee's thought that the use of the word "rear" in the lease was for the purpose of distinguishing that portion of the basement from the front part thereof, in which was located the barber shop. A more detailed statement of the facts is essential at this juncture.

Said Century Building is 90 feet long and 30 feet wide. There are three stories above the ground and a full basement beneath. In the front basement there is the aforesaid barber shop, entered from the sidewalk level. Likewise, from the same sidewalk level is an entrance through a passageway to the rear of the basement, wherein is located the heating plant above named. From that passageway also is an entrance into a restaurant, situated on adjacent property. Surrounding the heating plant is a partition, separating the remainder of the basement from the heating apparatus. Such furnace room covers a space extending approximately 13 feet from the rear basement wall toward the front entrance. Contained therein is the coal bin, steam-heating plant, and a hot-water heating plant. Notation is to be made that the barber shop previously mentioned extended out under the sidewalk a considerable distance. The part thereof which was actually in the basement under the building rather indefinitely appears to be about 10 feet. When the 13-foot extent of the furnace room is added to the 10-foot space in the barber shop, the total, of course, would be 23 feet. If that distance is subtracted from the 90-foot length of the basement, the remainder is 67 feet. So, after both the barber shop space and the portion of the basement occupied by the heating plant were eliminated, there still remained approximately 67 feet in the basement. Between this heating system and the barber shop are apparently two other rooms, one 24 feet wide and the other about 22 feet in width. Also, there is an uninclosed space, in addition to those two rooms. These two rooms just mentioned were the ones actually occupied by appellant until about the time the present action was commenced.

Albert J. Warnke, as lessor, and appellant, as lessee, on October 29, 1926, entered into the lease aforesaid, under which the term of the tenancy was to begin, January 1, 1927. At that

time, Warnke held title to the Waterloo property for and on behalf of certain banks in Des Moines. When the lease was executed by the parties as aforesaid, the G. R. Kinney Company held the premises, under an existing lease. One Stapher, at the time the present lease was executed, also held a lease for the second and third stories of the same building, together with the heating plant in the basement. That lease was assigned November 1, 1926, by Stapher to one Bergum, who took possession of the second and third stories and heating plant in the basement. During that time, the G. R. Kinney Company heated the first floor of the building with an Arcola heating plant located on that floor. A. J. Warnke lived in Des Moines, and the building at Waterloo was managed by R. N. Cowin. Mr. Cowin and appellant went to Des Moines, where the lease with the latter was signed by Warnke, October 29, 1926, as before explained.

After obtaining the aforesaid lease, appellant, by assignment, took over the G. R. Kinney Company lease, and immediately obtained possession of the premises. Although appellant occupied the premises during the remaining term of the G. R. Kinney Company lease, and then thereafter, for many years, under his own lease, yet not until recently did he at any time make claim to the heating plant in the rear of the basement. Throughout that entire period appellant heated the first floor thus leased by him with the aforesaid Arcola system, and the tenants in the hotel, occupying the second and third stories, heated their property with said heating system in the rear basement.

Appellant operated a shoe store on the first floor of the building, and used the portion of the basement before described for storing his merchandise. Subsequent to the time when the lease was executed by Warnke and appellant, the former, for and on behalf of the banks which he represented, sold and transferred the real estate to appellee; on or about February 1, 1929. As part of that transaction, the various leases on the building were assigned to and became the property of appellee. This change of ownership thereby became apparent to appellant, for he paid rent to appellee after the transfer; yet at no time did appellant claim that the heating plant in the basement belonged to him under the lease. Nevertheless, immediately prior to the institution of this suit, appellant, without appellee's knowledge or consent, locked the rear door to the basement, and prevented the hotel

people on the second and third floors from using the heating plant for the purpose of heating the hotel.

Hence, the present action was commenced by appellee : First, to obtain an injunction restraining the appellant from so doing; and second, to reform the lease so as to exclude therefrom any language claimed to be a basis for appellant's demand for the heating plant. Such relief was granted by the district court, and the appellant, therefore, asks that the judgment be reversed.

The basis for appellant's argument in this regard is: First, that the lease expressly covers the rear 60 feet of the basement, which includes the heating plant; and second, that there was no fraud or mistake which could in any way give rise to a reformation of the lease. Without such fraud or mistake, appellant urges, there can be no reformation.

"Reformation of a written instrument is to be made only when there is proof that the intention of the parties was to make an agreement such as it is sought to have established, and that said intention was frustrated either by fraud, accident, or mutual mistake." *Rankin v. Taylor*, 204 Iowa 384 (local citation 387).

"If the language [in the contract], even though it be that selected by the parties, when given a legal construction, fails to express or defeats their mutual intent and agreement, equity will reform it." *Brown v. Ward*, 119 Iowa 604 (local citation 609).

To the same effect, see *Kowalke v. Evernham*, 210 Iowa 1270.

"* * * in this state it is well settled that equity will grant relief for the purpose of making the legal effect of the instrument correspond to the express intention of the parties as disclosed in their negotiations." *Stelpflug v. Wolfe*, 127 Iowa 192 (local citation 193).

See, also, *Coleman v. Coleman*, 153 Iowa 543; *Halver v. Higgins Sheep Com. Co.*, 188 Iowa 806; *Flickinger v. Farmers' Mut. F. & L. Ins. Assn.*, 136 Iowa 258; *Chapman v. Dunwell*, 115 Iowa 533; *Conner v. Baxter*, 124 Iowa 219; *Cummins v. Monteith*, 61 Iowa 541.

In order to distinguish this proceeding to reform a written contract from an ordinary action at law to recover on a parol

agreement, the following excerpt is taken from *Allgood v. Fahrney*, 164 Iowa 540, reading on page 549:

"Equity only takes cognizance where the contract has been reduced to writing, and the writing does not express truly the actual contract entered into between the parties. Where the writing, through fraud or mistake, does not express the true contract, equity will reform the writing, which is the evidence of the contract, to conform it to the real contract, as actually made between the parties. But where the contract rests in parol, parol evidence is necessary to establish the contract, and the contract is that which the evidence shows it, in fact, was, and is enforced according to the proof, whether in law or in equity."

Of course, if the language used in the contract exactly expresses the intention of the parties, then equity will not reform the agreement and make a new one. Equity interferes only for the purpose of conforming the written contract to the intention of the parties: that is to say, equity makes the written contract become the actual agreement intended by the parties, and be what it would have been, were it not for the alleged mutual mistake or fraud. Does the contract, then, in the case at bar embody the real agreement between appellant and appellee? That is the question for determination here. No attack is made upon appellee's right to seek and obtain a reformation of the agreement on the theory that he was not the original lessor. It was assumed during the trial in the district court, and is now assumed in the arguments here, that, if appellee proves fraud or mutual mistake, the reformation may be allowed him. We accordingly do not discuss or decide the question of whether appellee, not being the original lessor, has a right to obtain reformation.

Our attention now is directed to the main problem involved. To repeat, does the contract as now written involve the actual agreement of the lessor and lessee? Appellant declares that it does. He says that, during the early negotiations with the aforesaid agent, R. N. Cowin, it was expressly understood that the heating plant in the rear of the basement was to be part of the leased premises, which together with the first floor of the building, were to be leased to the appellant. Likewise, appellant maintains that the early negotiations were later confirmed by Warnke, the then owner of the building. Such confirmed understanding,

appellant insists, intentionally became a part of the written lease executed between him and Warnke. Resultantly, appellant says there should be no reformation. Mr. Warnke, the former holder of the legal title to the building, testified at times in a way that would corroborate appellant. During one part of his testimony Mr. Warnke said:

"I mean to convey to you [an attorney in this case] in .my answer that Mr. Woerderhoff [appellant] had the privilege of furnishing heat for the two upper floors if he so desired, and such privilege was given him by the fact that he had the basement of the building rented from us (not all the basement, but the part that had the heating equipment in it)."

Further in his testimony, Mr. Warnke modified the foregoing statements by declaring:

"I did not understand at the time that we leased him [appellant] the heating equipment for the purpose of furnishing heat. No, I did not understand that the heating plant was then under lease to the tenant on the second and third floors."

Again modifying his original testimony, Mr. Warnke stated:

"I was not entirely familiar with the floor plan of the basement of this building * * *. I had been in the barber shop; had been in the entrance which was cut between that building and the cafe. * * * But I cannot recall * * * having been in the rear of the building. I have never been in the basement of that building back of the barber shop, or the rear hallway just immediately at the rear of the barber shop, that I remember. I did not know that there were some partitions in the basement back of the partitions immediately at the rear of the barber shop. *I knew that there was a heating plant in the basement only from hearsay. I did not know where the heating plant was located, nor I did not know where the coal bin was, nor I did not know there was a partition across the basement at the back end.*" (The italics are ours.)

Then, as shown by the amended abstract, Warnke finally concluded:

"Q. You knew that * * * the upper two stories were leased, and that the plant for heating was under lease to another person

[other than appellant] ? A. I didn't know it was under lease to another party. Q. And this rear 60 feet of the basement,—did you understand at the time it was to include all of the rear portion of the basement back of the hall that led over into the restaurant? A. Not having knowledge of the actual rooms or dimensions of the basement, I cannot answer that * * *."

A fair conclusion from Mr. Warnke's testimony is that he did not understand the exact dimensions of the basement. Neither did he know just how the heating plant was arranged therein. Also, it is apparent that Mr. Warnke was depending upon the knowledge and information possessed by the agent, Mr. Cowin. The agent was present at Des Moines when the provisions of the lease were decided upon between Mr. Warnke and appellant. After an agreement was reached concerning what was to be contained in the lease, a scrivener in Mr. Warnke's office was called upon to draft the same. It does not appear that the agent, Mr. Cowin, attended to or knew about the actual dictation of the lease. Clearly, however, Warnke was relying upon Mr. Cowin's knowledge and information concerning the terms and agreements to be embodied in the written lease. For, as before stated, Mr. Warnke knew nothing about the arrangement in the basement.

When testifying for appellee, Mr. Cowin, the agent, positively says that the heating plant was not to be included in appellant's lease. Repeatedly Mr. Cowin makes that declaration. So, too, Mr. Cowin says that Mr. Warnke did not agree, during the conference at Des Moines, that the heating plant should be included in the premises rented by appellant. There is much corroboration for Mr. Cowin's testimony upon this subject. For instance, the lease under consideration was executed October 29, 1926. Later, in November of that year, the agent, Cowin, sent to Mr. Warnke, for signature, duplicate leases for the hotel floors. In that lease the agent Cowin failed to say that the hotel keepers were to have access to the boiler room in the basement. Consequently, under date of November 16th, Mr. Warnke returned the leases to the agent Cowin, with a letter containing the following statement:

"I am returning them [the duplicate leases] as they do not contain a clause that the lessee is to furnish the heat."

Hence, Mr. Cowin, as agent, redrafted the lease by placing therein the following provision:

"Lessee [hotel keeper on the second and third floors of the building] shall furnish all heat for said premises, and may have access to boiler room and use of boiler for said purpose."

At that time, it is to be remembered, appellant's lease was in existence. Undoubtedly, therefore, Mr. Warkne, knowing that appellant's lease was in existence, would not have insisted that his agent, Mr. Cowin, should place the provision concerning the boiler room for the hotel in the hotel keeper's lease if appellant already had such a stipulation in his lease. Once more, Mr. Warnke, in a letter to the agent, Cowin, suggests that he did not understand that appellant had control of the boiler room; for, on January 17, 1929, long after appellant's lease was executed, Warnke wrote to the agent that appellee, the present owner, should "put in a new boiler which would have sufficient radiation surface to heat the whole building." If Mr. Warnke believed that appellant's lease gave the latter control of the boiler room, it would have been inconsistent to suggest that appellee had control thereof during the lease. Manifestly, Mr. Warnke, who depended entirely upon his agent, Cowin, for information concerning the terms of the lease and the situation in the basement, was confused when testifying. His own correspondence indicates that the hotel keepers, and not appellant, had the right to, and control of, the heating apparatus in the basement. Not only is the foregoing true concerning Mr. Warnke's understanding of the situation, but likewise appellant, in his conduct, suggests that he too thus understood the lease; because, as before said, at no time until about the date this action was commenced did appellant claim or indicate that he had any right to the heating plant in the basement.

Mr. Bergum, a hotel keeper, testified that the heating plant was leased to him by Warnke, and that he operated it in conjunction with the hotel on the second and third floors of this building. A few days after appellant took possession of the first floor, he went to the hotel and tried to buy heat from Mr. Bergum, the hotel keeper. It seems that they could not agree upon a price, and appellant said: "The Arcola is good enough to heat the room, anyway." That Arcola, it is to be understood, was a private

heating plant used on the first floor by appellant. Had appellant's lease provided that he was to have the heating plant in the basement, why was he, soon after entering the premises, trying to negotiate with the hotel keeper for heat through the basement heating plant? About the same time, appellant went to the Central Heating Company, a public utility concern in Waterloo, and negotiated with them for steam heat for the first story of the building. After this, appellant negotiated with the Central Heating Company time after time, in an endeavor to obtain heat for the first story, rented by him. So, too, he went to Bruner & Salz, steam fitters, to obtain an estimate from them about the cost of putting in heating equipment, in order that the first floor of the building might be heated with hot water, to be furnished by the aforesaid Central Heating Company. Were it then understood by appellant that he had a lease for the use of the heating plant in the basement, why would he have made all these negotiations and investigations?

Appellee testified that, after he took over the building, appellant asked that a new tenant be procured for the hotel who would be willing to furnish heat for the first floor through the basement heating apparatus at a price of $150 per year. Thereby appellant again recognized that the hotel tenant had the right to, and control of, the basement heating plant. Again, appellant went to Jacob Entz, the restaurant man, and insisted that his lease with Warnke extended back to the restaurant entrance. Apparently this would not have been necessary, had appellant figured his 60-foot space to the rear of the basement in such a way as to include the furnace room.

We have not attempted to set out all the record, but only enough thereof to indicate the general trend of the testimony. Obviously, the lease as now written does not express the true contract entered into between appellant and Warnke. Such fact has been recognized, not only by Warnke, as shown by the foregoing letters and incidents, but likewise by appellant, as demonstrated by his conduct. A mutual mistake caused the use of the unintended language contained in the lease, and thereby the intention of the lessor and the lessee was defeated. Evidence required to show the mutual mistake and sustain a reformation must be "clear, satisfactory, and convincing." Mere preponderance is not sufficient. *Rankin v. Taylor* (204 Iowa 384, local citation

387), supra; *Kowalke v. Evernham* (210 Iowa 1270), supra; *Woods v. Brand*, 187 Iowa 1076; *Haugh v. Lanz*, 187 Iowa 841; *Dare v. Foy*, 180 Iowa 1156.

The evidence in the case at bar meets that test beyond a doubt. There is every indication that the lease as now written does not embody the true intention of the parties, and the proof relied upon for reformation is clear, satisfactory, and convincing. That evidence rises to something more than a mere preponderance. It approaches proof beyond a reasonable doubt.

Wherefore, the judgment and decree of the district court should be, and hereby is, affirmed.—*Affirmed.*

FAVILLE, C. J., and EVANS, MORLING, and GRIMM, JJ., concur.