W. J. ALLGOOD, Appellee, v. A. E. FAHRNEY, Appellant.

**Brokers:** ACTION FOR COMMISSION: EVIDENCE. In this action for a broker's compensation the evidence is reviewed and held to support a finding that defendant engaged plaintiff to make an exchange of his farm, that he produced a party with whom an oral contract of exchange was made, ready, able and willing to perform, no objection being then made by defendant to an existing mineral lease.

**Same:** REFORMATION OF CONTRACTS: JURISDICTION. Equity will not reform a parol contract: it is only where it has been reduced to writing and the real agreement of the parties is not correctly expressed therein that equitable jurisdiction may be invoked for this purpose. Thus a suit upon a parol contract by a broker to make an exchange of lands will not be transferred to equity on the theory that it should be reformed.

**Same:** RECOVERY OF COMMISSION: STATUTE OF FRAUDS. Where a broker was authorized to procure one who was ready, able and willing to make an exchange for the land of his principal on terms acceptable to him, and such a person was procured with whom an oral contract of exchange was entered into, the broker is entitled to his commission, and his right thereto cannot be defeated by the subsequent refusal of his principal to proceed and reduce the contract to writing.

**Same:** RECOVERY OF COMMISSION. Upon refusal of the owner to carry out his oral contract of exchange, a sale or exchange by the other party of his land will not affect the right of the broker to his commission; he is not bound to keep the other party in readiness at all times to make the exchange.

**Practice:** SPECIAL INTERROGATORIES. Where plaintiff's right of recovery depends upon the existence of many facts, each having relation to the other and constituting the facts upon which the final conclusion rests, refusal to submit special interrogatories as to whether plaintiff had established the truth of every matter alleged was proper.

*Appeal from Mahaska District Court.*—HON. HENRY SILWOLD,
Judge.

TUESDAY, MARCH 24, 1914.

ACTION to recover commission for the sale of real estate.
—*Affirmed.*

*W. H. Keating,* for appellant.

*Reynolds & Davis,* for appellee.

GAYNOR, J.—It appears that the defendant was the owner
of certain property in the city of Oskaloosa; that the plain-
tiff was engaged in the real estate business; that some time
during the month of May, 1912, the defendant listed his
Oskaloosa property with the plaintiff, under an agreement
between them that, if the plaintiff would procure some one
who would purchase defendant's property or would exchange
other property for defendant's property, on terms satisfac-
tory to the defendant, the defendant would pay the plaintiff
a commission therefor; that plaintiff found one Peppers, who
owned a farm in Monroe county consisting of 210 acres; that
the plaintiff took the defendant down to look at that farm;
that the defendant did go down and look at the farm,
in company with the plaintiff; that at the time the plaintiff
told the defendant that there was a mineral right or coal lease
on the land in Monroe county; that, after the defendant had
looked the land over, he told the plaintiff that he wanted his
wife to see it before anything was done; that the defendant
looked the land over at that time, and expressed himself as
satisfied with it, but returned to his home without making
any contract with Peppers for the purchase of the land; that
thereafter he was taken sick, and was sick for some time; that
in the month of September following plaintiff again ap-
proached the defendant for the purpose of making a trade

with Peppers for the land in Monroe county, and took the defendant and his wife down and showed them the land. There is no controversy in the case as to the amount which defendant was to receive for his property in exchange, and the amount that Peppers was to receive for his land. Defendant placed his property at $20,000. The price of Peppers' farm was fixed at $31,500, leaving a difference of $11,500 to be paid by the defendant to Peppers on the exchange.

On the trial plaintiff testified, substantially, as follows:

Defendant said to me: 'If I sell, I would buy a farm; so I might as well trade for it. I have been looking at different farms, but found nothing that suited me.' I told him I thought I might get him a trade for the Peppers farm. I gave him a description of the place, told him I would see if Peppers would trade, and, if he would, I would let him know. So I called Peppers up over the phone, told what it was, where it was, and that he (Peppers) knew the place; and he said he would consider a trade. I told Fahrney that Peppers would trade. I also told him: 'There is a mineral right against that farm, but it has been sunk on and dug, and has been abandoned.' I knew the place over in there for about thirteen years. I and him went to Eddyville on the train, took a livery team, and drove out to Peppers', looked the farm over, and I asked him what he thought of it. He says: 'It is lots better than I expected, and better than you represented it.' I showed him where the shafts was, and told him this mineral right was there. Mr. Peppers told him the mineral right was there, and showed him where it had been dug out, and where the shafts was situated on the place, the piles of slack, and where the tram road was. We talked trade. Mr. Fahrney wanted his wife to see the place, but she wasn't able to go, and, as his wife wasn't able to go, the matter kept hanging. And Peppers says: 'I don't believe there is any use to wait on that Fahrney deal; I will just call it all off.' I told Mr. Fahrney that the deal was called off; this was the middle of May. Along in September I was down past Fahrney's feed yard, and he says, 'My wife is able to go and see the farm,' and I said, 'If you want to trade the way we talked of when we was over there, the price, and Peppers will trade.' I says, 'I will let you know.' So I . . .

went to the telephone, and called Mr. Peppers up, and talked to him over the phone, and told him the reason Mr. Fahrney couldn't do anything before was on account of his wife's health. Mr. Peppers said, 'I will give him one more trial.' We went over in an automobile, Mr. Fahrney, his wife, and I, with Mr. Spavin, from Oskaloosa. When we arrived at the farm, Mr. Fahrney says: 'The farm looks better to me than at first.' Then we took the wife in the automobile, and we went down the road where she could see all over the place, and we talked there, he and his wife between themselves (we was all in the automobile); and Mr. Spavin said for them to sit in the automobile, and Peppers, I, and Spavin left them sitting there, and we went away. Later Mr. Fahrney (defendant) called me to one side and asked if I expected a commission, and I said, 'If you are not going to pay me a commission, this deal will never go through.' I said, 'That is what I am working for;' and then he says, 'I will tell you; I cannot trade the way Peppers wants to trade.' The way the trade was to have been first, when we talked at the automobile, Peppers was to get possession of the feed yard, the 1st of October, and he was to keep all of the crop, and Mr. Fahrney to take possession of the farm the 1st of October, with the exception of the crop that was on it. Mr. Fahrney says to me, 'I cannot do that;' he says, 'I will give him the feed yard, and he would get profit on that, and I would have to take the farm, and get nothing out of it until I raised a crop;' and he says, 'I couldn't do that.' I talked with Peppers, and the latter agreed to give Fahrney one-half of the ninety acres of hay, which was bound in the field, when it was threshed, and one-half of the sixty acres of corn on the place, the land being farmed by a tenant, and there being 90 acres of hay being cut and bound, and 60 acres in corn, which Mr. Peppers was to receive from the tenant, one-half of each. I told Fahrney what Mr. Peppers would do, and he says: 'That changes things; that is all right.' We went to the house for dinner, which was not quite ready, and Mr. Fahrney asked for a measure to measure the rooms for sizes of carpets, and talked about buying the carpet on the stairs, and a large range stove. I wanted to go to Albia that afternoon and draw up the contract, and he says, 'Well I will tell you; I have got nobody left at the yard but a little boy;' and he says, 'I never made any arrangement for his dinner.' He says, 'I want to get back just as soon

as I can;' and he says, 'You come over in the morning, and we will draw up this contract.' Mr. Peppers came the next morning on the 7 o'clock train, and we went to the feed yard, spoke to Fahrney, told him we were ready to draw up a contract, and he says, 'While sitting here last night at 10 o'clock it came to me, if I wanted to sell that place, the mineral right would be a hindrance.' So we left him, and we went back several times. Fahrney's only kick was the mineral right.

Peppers, called as a witness for the plaintiff, testified substantially the same as the plaintiff, touching what was done and said regarding the trade, and further testified that all the terms of the exchange were agreed upon between him and the defendant, and that, when the defendant left after dinner, he said to Peppers, "You will be over tomorrow morning and draw up the contract as we have agreed upon for this farm," and I says, "Yes." I came over to draw the contract, and he said that he thought during the night that the mineral right might hinder him in disposing of the land. I was, at the time, ready, able, and willing to carry out my part of the contract."

He further testified that the trade was made there on the farm; that the defendant did not ask for longer time to consider the matter; that all was agreed upon except reducing it to writing, and it was agreed that that should be done the next morning; that they were to furnish abstracts, but that the defendant was to take it subject to the coal lease; that he was to accept the land subject to the coal lease; he was to accept the land with the coal lease on it. "The first time he came there I told him of the lease, and he saw a copy of it. While he was there on the farm, after he had inspected it, the defendant said he would take the place, and I said: 'We will go to Albia and draw up the contract.' I said: 'We ought to draw the contract specifying what the trade amounted to.' He said: 'Come to Oskaloosa in the morning and we will draw up a contract. Everything is satisfactory that we have agreed upon.' "

The defendant, testifying for himself, testified:

I know Mr. Allgood who came to me about the middle of May, 1912. I was working in my barn putting in a screen door. He told me about a farm in Monroe county. We talked about exchange, and I told him I would go and see the farm. He mentioned a coal or mineral lease of some kind, and I never lived in a mineral district, and I didn't think much about it. I didn't know anything about it, as I lived in Northern Iowa, and they didn't have coal mines there. He explained to me that there was nothing that would hinder, as the coal was all mined out, and he took quite a little time explaining to me that it wouldn't interfere with anything, the coal being all mined out, before we ever went to see the farm, and I asked the question whether that would hinder giving a clear title. We used the word 'clear title'; didn't use the word 'merchantable title'; I was to furnish him a clear title to my property. A clear title we talked; didn't use the word 'merchantable title.' We were to furnish clear titles to them. And he explained that to me at the time—very satisfactory at the time—that the coal lease was nothing that would interfere. So we went to see the farm. The farm is practically the same as stated by Mr. Allgood. I went and looked the farm over, everything looked good. I asked Mr. Peppers, 'How about this coal business?' and he did explain it to me very satisfactory that it was nothing that should interfere in any way whatever, because it was all mined out; and I took their word for it that it was. Then nothing more was done until September, 1912, when Mr. Allgood came to my place. He had come several times, and he thought we might get the deal through for Peppers' farm, and he telephoned and said for my wife and I to come down; so my wife and I, with Allgood, went to the farm in an automobile. At this time absolutely nothing was mentioned about the coal lease, because I hadn't thought anything about it from the time of the first deal until after I got home in the evening, when the thing came up to me about the title. That question came to my mind, and in the morning, when Peppers and Allgood came to go into the contract, I said, 'Boys, now I got to studying about that this would be a clear title; whether there was a clear title to this.' I argued that it would be a blemish to the

sale of the property; and they argued that it would not. Anyhow, that was the argument. Finally Mr. Peppers apparently got a little out of humor, and I says, at any rate, I asked him the question whether that could be released in any way off of the farm. Well, we were arguing the case whether that would be considered a clear title. We didn't use the word 'merchantable title'; but we did use the word 'clear title.' I was to furnish a clear title. So were they. That was the first deal we talked. The question then was whether that actually done so, and that brought up the question that morning. There was nobody open yet to go to get a contract, as far as that goes, because possibly it was only about 8 o'clock in the morning. I argues that that would not be a clear title, that I couldn't sell the farm with that on it; and they argued, I couldn't say just how, but, any rate, we had an argument there. They told me there was a coal lease there, but, of course, they explained it to me satisfactory at the time that it wasn't no harm to anything, and that, of course, settled it in my mind that wasn't going to be any hindrance to a clear title. So that morning, when we went to see the farm, we went ahead and supposed the deal was all through, until I brought up that question. Now, I never refused to go on with the deal; never refused to. I stood ready all of the time, willing and anxious to make the deal. I was well pleased with the farm. My wife was well pleased with the house. We wanted to make the deal, and was ready there to make the deal, and I simply raised the question there that morning, before we could go any place to make a contract. Thereupon Peppers said: 'If you don't take it that way, some one else will.' They went away and left me. I supposed it was settled then. Along about 9 o'clock plaintiff came back. He commenced talking about drawing the conveyance; that the lease wouldn't be any hindrance. But I shook my head. I couldn't see how that could be considered a clear title. Thereupon, upon his request, we went to an abstractor and submitted the question. We asked the abstractor whether it would be considered a clear title with that lease. I was giving an abstract to show clear title. So were they. I asked the abstractor the question. He said it would not be a clear title with the lease; that there would likely be some expense to removing it. It might not be much as the coal was all worked out. It might cost nothing. I didn't change my mind about the trade.

The morning they came to me I raised the question about the lease, whether that was a clear title.

Then this question was asked him:

Q. Then, as I understand you, you wanted to tell the jury that you knew from the beginning that there was a coal lease on the land? They explained it to you; that you had a couple of months to study over it; and that about 11 o'clock, after the bargain had been made, you thought that the title might not be a clear one, and that that spoiled the trade, and that is the basis of your refusal to pay commission. Is that right? A. I never refused to trade, understand me. I didn't refuse to complete the deal. I simply raised the question whether that was a clear title. They refused to go on with the deal, rather than furnish what I would consider a clear title. I was told the lease was on the land. I didn't tell them that the deal was completed at the farm. I told them to come over to Oskaloosa the next morning; that there were things to be considered yet. I didn't enter into any contract on the farm. I said to Mr. Peppers: 'This is quite a deal. We ought to consider it; think it over.' I said there were lots of things to come up that we haven't thought of. I told him to come to Oskaloosa in the morning, and he said he would. He came, and, of course, as I have stated, in the meantime this matter of a clear title came into my mind.

Without setting out the evidence in full, there is evidence from which the jury might have found that the defendant accepted the farm with the coal lease on it; that all the terms of the exchange were agreed upon between Peppers and the defendant while on the farm; that there was nothing said between them as to the character of the title of the property of either; that the only agreement was to furnish an abstract, if requested. It appears that no request for an abstract was made by either party. There is evidence to the effect that this mine had been abandoned from fourteen to sixteen years; that the defendant had full knowledge of the character of the work done in the mine, and the condition in which the

1. BROKERS: action for commission: evidence.

land was left; that he saw a copy of the lease the first time
he was down there. He testifies, however, that he did not
know the terms of the lease. There is evidence that at the
time he was about to return home from the farm, after exam-
ining it with his wife, he said he would take the place on
the terms, and Peppers and the plaintiff said, ''We will go
to Albia and draw up the contract;'' and he said, ''I cannot
go to Albia, but will meet you in Oskaloosa the next morn-
ing. Come to Oskaloosa in the morning, and we will draw
up the contract. Everything is satisfactory that we have
agreed satisfactory; that we have agreed upon.''

From the evidence submitted, the jury might well have
found the following facts: That the defendant employed
plaintiff to procure the exchange of property between him
and Peppers; that plaintiff brought the defendant and Pep-
pers together; that they entered into a contract satisfactory
to both for the exchange, on defendant's second visit to the
farm; that nothing was said about the character of title to
be delivered by either; that it was agreed that an abstract
should be given by each, if requested; that no abstract was
requested; that Peppers appeared the next morning at Oska-
loosa at the request of the defendant, and that he was then
ready, able, and willing to perform all the conditions of his
contract, and make the exchange agreed upon; that the de-
fendant objected to carrying out the contract because of the
lease, fearing that the lease might interfere with the resale
of the property. The jury might well have found that the
defendant was informed, before he made the contract, of all
the conditions of the lease, and that he agreed to take it sub-
ject to the lease. Surely, then, the plaintiff had performed
all that was required of him, or that he could perform in
consummating the deal. It was then up to the defendant to
perform; Peppers being ready, able, and willing to perform.
His refusal to perform did not relieve him of his obligation
to pay plaintiff's commission. So much for the facts.

The first complaint made by the defendant is that the

court refused to sustain his motion to transfer the cause to the equity side of the calendar for trial.

2. SAME: reformation of contracts: jurisdiction.

Plaintiff claims that he has alleged in his answer certain equitable matters which entitle him to have the case so transferred. He seems to base this on the idea that equity has jurisdiction to reform contracts, and that his rights could not be protected until the contract, as stated by plaintiff in his petition, was reformed. But it is apparent, from this record, that both the contract between the plaintiff and the defendant and the contract between defendant and Peppers rest in parol. There was no writing evidencing either contract. Equity will not make contracts for parties, nor *reform contracts*. Equity only takes cognizance where the contract has been reduced to writing, and the writing does not express truly the actual contract entered into between the parties. Where the writing, through fraud or mistake, does not express the true contract, equity will reform the writing, which is the evidence of the contract, to conform it to the real contract, as actually made between the parties. But where the contract rests in parol, parol evidence is necessary to establish the contract, and the contract is that which the evidence shows it, in fact, was, and is enforced according to the proof, whether in law or in equity. This is clearly a law action; and the court did not err in refusing to transfer the cause to equity for the purposes suggested by the defendant.

The next contention is that the contract between Fahrney and Peppers was not in writing; that no binding contract was made effectual between Peppers and the defendant. This

3. SAME: recovery of commission: statute of frauds.

is not necessary. The contract having been made between Peppers and defendant in parol, and Peppers having appeared ready, able and willing to perform his contract and to make the exchange, and to make the writing to evidence the exchange, the fault was the defendant's that it was not consummated. All that was necessary to be done by the defendant was to consum-

mate the contract by reducing it to writing to make it an effectual, binding contract upon Peppers. He cannot hide behind his own wrong in refusing to do so.

As stated in *Bird v. Phillips,* 115 Iowa, 703: "Another objection in this connection is that plaintiff did not have a binding agreement with the would-be purchaser. A verbal agreement on the part of the buyer that he would effect the purchase is sufficient." See, also, *Ford v. Easley,* 88 Iowa, 606.

In this last case it is said: Where an agent "is employed to sell property at a designated price, and on stated terms, he is entitled to his commission when he has found a customer who is able and willing to take the property at that price, and on those terms, whether a sale is consummated or not." And it is the holding of this case that, when an agent finds a person who agrees to take the property on the terms given, and is able, ready, and willing to carry out the agreement, he has done all he was authorized to do to effect a sale, and is entitled to his compensation for his services.

The rule generally is that, where an agent who is authorized to procure a purchaser for his principal's land, or to make an exchange of land, on terms satisfactory to his principal, procures one who is ready, able, and willing to purchase, or make the exchange on terms satisfactory to the principal, and an oral contract is entered into between them as to the terms upon which the sale or exchange shall be made, and the sale or exchange is actually agreed upon, satisfactory to both parties, though not reduced to writing, and though not enforceable by either the buyer or the seller because of the statute of frauds, yet, if the purchaser procured is, at the time, ready, able and willing to perform all the conditions of the contract and enter into a written instrument binding both parties, and nothing remains to be done on the part of the agent's principal except to make the writing which would bind it, and he refuses to do so, the agent is entitled to his commission, because he has done all that

his contract requires him to do, and has earned his commission. The failure to consummate the contract was the fault of his principal alone.

Some complaint is made of the action of the court in refusing defendant the right to show that Peppers had subsequently sold the land to another. There was no error in this. The plaintiff was not bound to hold

4. SAME: recovery of commission. Peppers in readiness, at all times, after defendant had refused to complete the contract. Nor could he control Peppers' action in disposing of the land thereafter. Defendant had his opportunity and refused to avail himself of it.

Many other questions are raised and argued on this appeal which are in no way relevant to the issues joined, and no way determinative of any right involved in this suit, and we pass them by without comment. This is purely a fact case, with the evidence conflicting. The jury have decided the facts in favor of the plaintiff, and there is evidence to support their finding. In such cases we do not interfere.

Some question is raised as to the instructions given by the court. We have examined these instructions with care, and find that they fully and fairly present all the issues and the law proper to be submitted to the jury in determining a case of this character. The law governing the rights of the parties, under facts such as are disclosed here, has been so often discussed by this court, and so fully determined, that we do not feel called upon to reconsider these questions again.

Practically the only issue raised by defendant's answer involved the truth of plaintiff's contention, as set out in his petition. A general denial raised the only issue which could be properly submitted to the jury under this record, and it was so submitted by the court.

The special interrogatories asked by the defendant could not properly have been submitted by the court. The jury

are not required to find specially the truth or falsity of every claim raised by a party in his pleadings. This is true where the ultimate conclusion depends upon the existence or non-existence of many facts, each of which have a relation to, and form a chain in, the facts and circumstances on which the final conclusion rests, and courts do not submit special interrogatories to juries, except as to the ultimate facts.

5. PRACTICE: special interrogatories.

We have examined this record, and we find no reversible error, and the cause is therefore—*Affirmed.*

LADD, C. J., and DEEMER and WITHROW, JJ., concur.