JOHN DAMERS, et al. *vs.* THE TRIDENT FISHERIES COMPANY.

Cumberland.    Opinion October 25, 1920.

*Broker. Commission. Differentiation between a broker employed to sell, and one employed to find a purchaser. A contract lawful when made, which becomes illegal by subsequent statutory enactment, is to be considered at an end. When the principal refuses on good grounds to complete the transaction, the broker is not entitled to commissions.*

This is an action of assumpsit on an account annexed for brokers' commissions and interest, amounting to $13,920, as claimed to be due for the sale of two steamers, and is before the court on the plaintiffs' exceptions to a ruling of the Justice of the Superior Court for Cumberland County granting defendant's motion for a non suit.    The account annexed to the writ follows:

The Trident Fisheries Co., Portland, Maine

To

| | | | John Damers And Company, New York City, | Dr. |
|---|---|---|---|---|
| Feb. | 3, 1917 | | To commissions as broker upon the sale of the Steamer "Easthampton", 5% of selling price ($125,000), as agreed...... ................... .. .......................................... .. ........ | $6,250 |
| " | " | " | To commissions as broker upon the sale of the Steamer "Long Island", 5% of selling price ($115,000), as agreed ... .. ............. ............. ... . ..... .... .. ....... .. ......... ........ | 5,750 |
| | | | | $12,000 |

Oct. 3, 1919, To interest thereon at 6% per annum from Feb. 3, 1917, when demand was duly made.............................. · 1,920

$13,920

The money count was also added, under which the same evidence was presented as that in support of the account annexed.

*Held:*

1. As a general rule a broker is not entitled to compensation until he has performed the undertaking assumed by him; and in the absence of any contrary provision in his contract, it matters not how great have been his efforts nor how meritorious his services; if he has been unsuccessful he is not entitled to compensation. The plaintiff's principal witness on being questioned as to the commission said that the same were to be paid "in the event we sold the boats." That understanding of the contract can only mean an actual sale, or the procuring a completed, definite and unconditional contract of sale binding upon both parties.

2. But in order to entitle a broker to commissions, the customer produced by him, and the principal, must come to a final agreement on the terms of the transaction. Consequently, the conclusion of a preliminary or tentative agreement which is not binding on the parties, and which is not carried into effect, does not give a right to compensation.

3. To entitle a broker to a commission when no sale is actually consummated, a broker employed to find a purchaser must either produce to the owner a customer who is able, ready, and willing to buy on the terms prescribed by the owner, or else take from the customer a binding contract of purchase, unless those requirements are waived by the principal's refusing to proceed after notice by the broker that he has such a contract or purchaser.

4. A broker employed to sell, as distinguished from a broker employed to find a purchaser, is not entitled to compensation until he effects a sale, or procures from his customer a binding contract of sale.

5. To entitle a broker to his commissions, he must accomplish what he undertook to do in his contract of employment, for, as a rule nothing short of that is sufficient to constitute a performance on his part. In the absence of hindrance or fraud on the part of his employer, he must perform all the conditions of the contract made with his principal, or he cannot recover.

6. The question whether a sale of personal property is completed or only executory, in cases between buyer and seller and where neither the Statute of Frauds · nor the rights of third parties are involved, depends upon whether it was the intention of the parties at the time the contract was made that the title to the property should immediately pass to the buyer; and when no such intention is expressed in the contract itself, then all the facts and circumstances under which the contract was made are to be examined to discover if such an intention is the meaning of the acts of the parties. Keeping in sight always the fact that it is the real intention of the parties that is to control, courts have adopted certain rules to aid them in discovering that intention.

7.  It was the duty of the plaintiffs to make a sale or obtain a binding and enforceable agreement for the sale and transfer of the steamers in the first instance, but, even then, in the presence of the circumstances in this case, assuming that the plaintiffs had performed all of the conditions required by the contract, they are presumed to have acted with full knowledge of the existence of the law; for while the statute was to be without effect until an emergency was proclaimed to exist, it was still the law, and they are charged with a knowledge of its existence and provisions, and are bound thereby. Any other conclusion would work an injustice not heretofore tolerated by courts of law.

8.  When a contract legal at its inception becomes illegal by subsequent statutory enactment, no action can be maintained on such contract for a failure to perform the conditions of such contract after the illegality has attached.

9.  It is a general principle of law that where a contract is lawful when made and a law afterwards renders performance of it unlawful, neither party to the contract shall be prejudiced and the contract is to be considered at an end. When the principal has good grounds for refusal to complete the transaction and does so, the broker is not entitled to commissions. But the grounds for refusal must be substantial.


This is an action of assumpsit on an account annexed to recover brokers' commissions of 5% of $240,000, the selling price of two steamers, amounting to $12,000, and interest on same of $1,920, making a total of $13,920.

The defendant filed a plea of the general issue, and a brief statement of special matter of defense, alleging that on the fifth day of February, A. D. 1917, the President of the United States of America by proclamation of that date declared a national emergency to exist and in accordance with said proclamation the United States Shipping Board declined to permit the proposed sale of the steamers mentioned in the declaration of the plaintiff. At the conclusion of the plaintiffs' evidence, on motion by counsel for the defendant, the presiding Justice in the Superior Court for Cumberland County, where the case was being tried to a jury, ordered a non suit, to which ruling plaintiff excepted. Exceptions overruled.

Case fully stated in the opinion.

*Maurice E. Rosen,* for plaintiff.

*Bradley & Linnell, and Carl C. Jones,* for defendant.


SITTING:   CORNISH, C. J., SPEAR, HANSON, PHILBROOK, MORRILL, WILSON, JJ.

HANSON, J.   This is an action of assumpsit on an account annexed for brokers' commissions and interest, amounting to $13,920, claimed to be due for the sale of two steamers, and is before the court on the plaintiffs' exceptions to a ruling of the Justice of the Superior Court for Cumberland County granting defendant's motion for a non suit. The account annexed to the writ follows:

THE TRIDENT FISHERIES CO., Portland, Maine

To

John Damers And Company, New York City,   Dr.

| | | |
|---|---|---:|
| Feb. 3, 1917 | To commissions as broker upon the sale of the Steamer "East Hampton," 5% of selling price ($125,000), as agreed............... | $6,250 |
| " "  " | To commissions as broker upon the sale of the Steamer "Long Island", 5% of selling price ($115,000), as agreed... ......... .......... | 5,750 |
| | | $12,000 |
| Oct. 3, 1919, | To interest thereon at 6% per annum from Feb. 3, 1917, when demand was duly made... ............... ........... ............... ......... | 1,920 |
| | | $13,920 |

The money count was also added, under which the same evidence was presented as that in support of the account annexed.

The essential facts to be considered are taken from the exceptions. The plaintiffs are ship brokers.   In December, 1916, the plaintiffs' agent, Layton, became acquainted with one Robb, who represented a firm known as Leonard Bros. of Montreal, Canada, who were desirous of purchasing certain ships.   Robb gave Layton a description of the kind of boats that they were interested in, which Layton reported to his firm, the plaintiffs.   The plaintiffs then sent out a circular letter to concerns who might have such boats and received a reply from the defendant.   Upon receipt of the reply Layton came to Portland and talked to W. F. Leonard, treasurer of the defendant concern, who was fully authorized in whatever he might have done as treasurer of the defendant concern, on January 27th, 1917, in reference to the sale of the steamers "Long Island" and "East Hampton" then owned by the defendants.

Layton told the defendant's treasurer that he had a prospect in Leonard Bros. of Montreal and it was then agreed that the defendant was to pay the plaintiffs a commission of 5% on the selling price of the steamers "East Hampton" and "Long Island" in the event of sale. Layton then requested that the defendant give them a writing to that effect, and the defendant on January 27th, 1917, directed a letter on their letter head to the plaintiffs and delivered to Layton in hand, and which reads as follows:

"We offer you for your clients, Messrs. Leonard Bros. of Montreal, subject to prior sale, the steamer 'East Hampton' at a price of $125,000 and the steamer 'Long Island' at a price of $110,000. Both steamers are equipped for beam trawler fishing and the above prices include such equipment. Should you effect a sale of either or both steamers we would allow you a brokerage of 5% on the selling price."

Upon receipt of this letter Layton went back to New York and immediately got in touch with Leonard Bros. through Mr. Robb, who was representing them, and got the parties negotiating between themselves by telegram, etc. The plaintiffs then arranged for a meeting between Mr. Robb, representing the purchaser, and Mr. Leonard, the treasurer of the defendant concern and brought the two of them together at the Hotel Manhattan in New York City on Feb. 3rd, 1917. Robb and Leonard at that time talked the terms of the trade over and then sent for a public stenographer in the hotel and drew up the following agreement:

"New York, Feb. 3rd, 1917.

We, the Trident Fisheries Company, of Portland, Maine, agree to sell to Leonard Brothers of Montreal, Quebec, the steamer 'East Hampton' for $125,000.00, and the steamer 'Long Island' for $115,000.00. The steamer 'East Hampton' having already been reported upon by your surveyors as being in good condition. Below the water line, however, has not been inspected and this is subject to final inspection.

And the Trident Fisheries Company agrees to put the steamer 'Long Island' also in good condition and this is subject to final inspection of your surveyors.

The transaction covering the 'East Hampton' to be completed within ten days from date and payment made in United States

currency before steamer leaves Portland. Delivery of the 'East Hampton' to be made on any day arranged for within that time.

The 'Long Island' sale to be concluded upon completion of repairs, not later than March 1st.

The Trident Fisheries Company agrees to send both steamers to Halifax or St. John, and also to keep them covered by insurance until delivered to either of these ports.

The Trident Fisheries Company agrees to supply and pay for the crew, fuel, and stores covering the trip from Portland to Halifax or St. John.

The above is made binding in the consideration of one dollar in U. S. currency paid by Leonard Bros. of Montreal to the Trident Fisheries Company of Portland, Maine, receipt of which is acknowledged by said Trident Fisheries Company.

IN WITNESS, WHEREOF the Trident Fisheries Company has caused this agreement to be concluded in its name and on behalf of one of its officers thereunto, duly authorized, and Leonard Brothers have signed this agreement by their agent thereunto fully authorized by them, this day and year first above written.

THE TRIDENT FISHERIES COMPANY
          W. F. LEONARD,
               Treasurer.

                         LEONARD BROTHERS,
                         (W. F. Leonard & D. J. Bryne)

                              THOMAS ROBB,
                              Attorney in Fact.
In presence of C. T. CLAYTON."

The plaintiffs contend that the agreement entered into between Leonard Brothers and the defendant on February 3, 1917, is not only a binding agreement of sale, but an actual sale, and that the instrument above mentioned (dated Feby. 3rd) in and of itself sustains the claim. In effect the plaintiffs' contention is that the contract of January 27, 1917, was a general broker's contract, and that they have performed all they were bound to do by producing a customer able, ready and willing to buy and who entered into a binding agreement with the defendant.

The defendant contends that the "instrument dated February 3, 1917, was not a binding agreement to buy and sell, but was an option, and that the contract relied upon by the plaintiffs cannot be considered a general broker's contract because it expressly required the plaintiffs to sell to a specific purchaser, Leonard Bros., for a specific price, commissions to be earned in event of a sale, and that the contract is therefore a special broker's contract."

The defendant by way of brief statement further says: "That in accordance with Section 9 of 39 Statutes at Large of the United States, Chapter 728, on the fifth day of February, A. D. 1917, the President of the United States of America by proclamation of that date declared a national emergency to exist and in accordance with said proclamation the United States Shipping Board declined to permit the proposed sale of the vessels mentioned in the plaintiffs' declaration."

As to the instrument dated January 27th, 1917, we are of the opinion that it is a special broker's contract, and by its terms clearly to be distinguished from the general broker's contract commonly held to be a contract to produce a customer, ready, willing and able to buy. The language used demonstrates this:—"We offer you for your clients Messrs. Leonard Brothers of Montreal, subject to prior sale;" . . . . and "should you effect a sale . . . . we would allow you a brokerage of 5% on the selling price." There is nothing in the words used here of a general nature; on the contrary every reference to the subject matter, as well as the compensation, is specific, and nothing is left to inference. The document speaks for itself.

Under such circumstances, and in view of the terms of employment here used, courts have uniformly held that a broker employed to sell, as distinguished from a broker employed to find a purchaser, is not entitled to compensation until he procures from his customer a binding contract of sale. 9 C. J. 609, Section 94 (a), and cases cited. "As a general rule a broker is not entitled to compensation until he has performed the undertaking assumed by him; and in the absence of any contrary provision in his contract, it matters not how great have been his efforts nor how meritorious his services. If he has been unsuccessful he is not entitled to compensation." 9 C. J. 587, and cases cited. *Hutchins* v. *Lewis*, 104 Maine, 27. The plaintiffs' principal witness on being questioned as to the commission said

that the same were to be paid "in the event we sold the boats." That understanding of the contract can only mean an actual sale, or the procuring a completed, definite and unconditional contract of sale binding upon both parties. *Hutchins* v. *Lewis*, 104 Maine, 27. But in order to entitle a broker to commissions, the customer produced by him, and the principal, must come to a final agreement on the terms of the transaction. Consequently, the conclusion of a preliminary or tentative agreement which is not binding on the parties, and which is not carried into effect, does not give a right to compensation. 9 C. J. 603; *Clark* v. *Bonner*, 217 Mass., 201; *Wiggin* v. *Holbrook*, 190 Mass., 157. To entitle a broker to a commission when no sale is actually consummated, a broker employed to find a purchaser must either produce to the owner a customer who is able, ready, and willing to buy on the terms prescribed by the owner, or else take from the customer a binding contract of purchase, unless those requirements are waived by the principal's refusing to proceed after notice by the broker that he has such a contract or purchaser. 9 C. J., citing 608 *Jamieson* v. *U. S. Farm Land Co.*, 206 Fed., 889; *Payseno* v. *Swenson*, 178 Fed., 999. The same authority, page 609, under sub-section 96, note (a) cites *Wiggins* v. *Wilson*, 55 Fla., 346, as supporting the foregoing, and with other authorities supporting the rule that, "A broker employed to sell, as distinguished from a broker employed to find a purchaser is not entitled to compensation until he effects a sale, or procures from his customer a binding contract of sale." See cases cited Page 609 (a). To entitle a broker to his commissions, he must accomplish what he undertook to do in his contract of employment, for, as a rule, nothing short of that is sufficient to constitute a performance on his part. In the absence of hindrance or fraud on the part of his employer, he must perform all the conditions of the contract made with his principal, or he cannot recover. 4 R. C. L. 303, citing *Strout* v. *Gay*, 105 Maine, 108; *Garcelon* v. *Tibbetts*, 84 Maine, 148. In *Condict* v. *Cawdrey*, 139 N. Y. 273, in an action by a real estate broker for commissions, based upon a written memorandum of employment, as follows: "I hereby agree to pay you a commission of ten per cent on the price I may accept for the 435,000 acres of land in Eastern Kentucky belonging to me, if sold through your agency. I hereby acknowledge your agency in bringing Jere Baxter and his associates to me, whereby a refusal until Sept. 10 next was given to me." An option was given Baxter

on the same day. The court say: "By the contract between the plaintiff and defendant he was not entitled to commissions, unless there was an actual sale of the property effected through his agency. . . . . It must appear to have been a binding and enforceable agreement for the sale and conveyance of the land; and it is not sufficient to show a provisional arrangement which has failed because of the non-fulfilment of a condition not dependent upon the action of the vendor." In *Clark* v. *Bonner*, 217 Mass., 201, it was held, that a real estate broker does not earn a commission for procuring a purchaser for certain real estate at a stated price by bringing about the execution of a contract in writing in which the alleged purchaser agrees to buy the real estate at that price, if by the terms of the contract the owner accepts the purchaser only upon the condition that he shall pay a substantial part of the price in second mortgages on the purchased property and "other properties satisfactory to" such owner, and it appears that this condition never was performed by the proposed purchaser. In *Gilman et al.* v. *Stock*, 95 Maine, 359, it was held "that an agent with full authority to bind his principal absolutely may yet properly stipulate that the contract shall not be binding until confirmed by his principal. . . . . The plaintiffs in this case were limited by the contract they saw fit to make with the salesman, however far short of his actual powers. Their action at law is based on this contract and cannot be sustained for want of the confirmation stipulated for therein. In *Russell* v. *Clark*, 112 Maine, 160, an action on a contract for the delivery of certain lumber, it was held, that "the question whether a sale of personal property is completed or only executory, in cases between buyer and seller and where neither the statute of frauds nor the rights of third parties are involved, depends upon whether it was the intention of the parties at the time the contract was made that the title to the property should immediately pass to the buyer; and when no such intention is expressed in the contract itself, then all the facts and circumstances under which the contract was made are to be examined to discover if such an intention is the meaning of the acts of the parties. Keeping in sight always the fact that it is the real intention of the parties that is to control, courts have adopted certain rules to aid them in discovering that intention. And it is too well settled to require the citation of authorities, that where anything remains to be done to identify the particular property to be sold; or to ascertain the price to be paid for it by selecting it as to quality,

and weighing or measuring it as to quantity; or where the seller is to do certain things to the property to put it in that condition or situation in which it may or ought to be accepted by the buyer, the performance of those things are to be deemed presumptively a condition precedent to the passing of the title to the buyer." It is apparent from the repeated reference to "subject to inspection," as well as from other features of the contract of sale, that it was not the intention of the parties at the time the contract was made that the title to the property should immediately pass to the buyer. The plaintiff's testimony discloses that if inspection of the steamers did not result to their satisfaction, they could reject the contract.

The document offered by the plaintiffs as above is therefore an option. It possesses all the elements of an option and especially the general characteristic that only one party is bound by its terms in the first instance, although signed by both parties. The instrument is neither a sale nor an agreement to sell and buy; it gives but the right to buy, and imposes no duty to buy; it is therefore unilateral, binding the vendor only. Such an instrument is an option. *Hanscom* v. *Blanchard,* 117 Maine, 501. It was not a sale because it was not the intention of the parties that the property should pass until the conditions were performed and payment should be made later; nor was it a contract to sell because the optionee was not bound to buy. Tiffany on Sales, 2nd Ed., Page 8, and cases cited.

As to defendant's plea by way of brief statement: That part of Sec. 9, Chap. 451, U. S. Statutes at Large, 1915-1916, entitled an Act to establish a United States Shipping Board, etc., invoked by the defendant, reads as follows:—"When the United States is at war, or during any national emergency the existence of which is declared by proclamation of the President, no vessel registered or enrolled and licensed under the laws of the United States, shall, without the approval of the board, be sold, leased, or chartered to any person not a citizen of the United States, or transferred to a foreign registry or flag. No vessel registered or enrolled and licensed under the laws of the United States, or owned by any person not a citizen of the United States, except one which the board is prohibited from purchasing, shall be sold to any person not a citizen of the United States, or transfered to a foreign registry or flag, unless such vessel is first tendered to the board at the price in good faith offered by others, or, if no such offer, at a fair price to be determined in the manner provided in section ten."

While the question is one of first impression in this court, we are of the opinion that the statute is a complete bar to the action, and this conclusion is supported by reason and the weight of authority. The option was enforceable, and the testimony shows that both parties intended to carry it out in detail until it was known that a Presidential order declaring an emergency and calling into effect the section of the statute above referred to had been issued. And after the emergency was declared, both parties sought relief by appeal to the United States Shipping Board, and were unsuccessful. The fact and date of the President's declaration are admitted. The final question is, does such declaration making the statute effective excuse the defendant from the performance of its agreements in its option? We think it does. The general rule is that if, after such contract is entered into, a statute is passed rendering it illegal, the promissor is no longer bound. Tiffany on Sales, Page 310, and cases cited. But it is urged that the statute was not passed after the contract was entered into, but was enacted six months before, to wit, on September 7, 1916, and that the statute does not apply for that reason. We do not see the force of this contention. The statute was passed for a definite, serious purpose, by legislators who had in view the gravity of that purpose, and whose intentions were as serious and definite as the expected emergency could induce. The statute was but a preparation, a means to be used instantly if the emergency arose, and was necessarily inactive and without full effect until the emergency was declared by the President to exist. It then became active, and only then had the force and effect of laws passed without limitation or restriction. It could not operate before the emergency was declared, but it was the law nevertheless. It could and did operate thereafter and possessed all the force which the Congress intended it should have. It therefore was the law after the contract was signed on February 3, 1917, and was a legal excuse and justification for the defendant's refusal to transfer the steamers involved in this action. The proclamation was issued February 5th, 1917. All the conditions named in the option were to be performed after that date. It was the duty of the plaintiffs to make a sale or obtain a binding and enforceable agreement for the sale and transfer of the steamers in the first instance, but even then, in the presence of the circumstances in this case, assuming that the plaintiffs had performed all of the conditions required by the contract, they are

presumed to have acted with full knowledge of the existence of the law; for while the statute was to be without effect until an emergency was proclaimed to exist, it was still the law, and they are charged with a knowledge of its existence and provisions, and are bound thereby. Any other conclusion would work an injustice not heretofore tolerated by courts of law. Clark on Contracts, 2nd Ed., 474-475; *Jones* v. *U. S.* 96 U. S. 24; 3 A. L. R. 21 Note. In *Hartford* v. *McGillicuddy*, 103 Maine, 224, where action was brought by a real estate agent to recover commission on the price fixed by the owner, the plaintiff claiming that he procured a customer on the authorized terms, but that the defendant refused to make the conveyance, this court while sustaining a verdict for the plaintiff, restated the rule ,that, "Contracts of agency may be terminated by operation of law, but such cases fall within one of three classes;—a change in the law making the required acts illegal, a change in the subject matter of the contract as the destruction of the property by fire, or change in the condition of the parties, as by death or insanity. 1 Clark and Skyles Agency, Sec. 181. In *American Mercantile Exchange* v. *Blunt*, 102 Maine, 128, an action on a contract by a collection agency, whose business of advertising claims was curtailed by statute after the contract was entered into, the court held that, "When a contract legal at its inception becomes illegal by subsequent statutory enactment, no action can be maintained on such contract for a failure to perform the conditions of such contract after the illegality has attached. "The opinion quotes from *Odlin* v. *Insurance Company*, Federal Cases, Vol. 18, No. 10433—"It is a general principle of law that where a contract is lawful when made and a law afterwards renders performance of it unlawful, neither party to the contract shall be prejudiced and the contract is to be considered at an end." See *Dingley* v. *Bath*, 112 Maine, 93. "When the principal has good grounds for refusal to complete the transaction and does so, the broker is not entitled to commissions. But the grounds for refusal must be substantial." 9 C. J. 626 and notes.

It is sufficient to say that the grounds rendering the defendant unable to perform its contract were not only substantial, but were recognized by the plaintiffs and the buyers as well, as an excuse, unless by their combined efforts the consent of the Shiping Board could be procured. The failure to transfer the ownership cannot be regarded as a refusal, but was rather an acceptance of the law as

declared to which they must yield obedience. The plaintiffs are similarly affected by the same provisions of the statute. It is evident that all concerned were disappointed at the outcome, and that the statute and proclamation by the President alone prevented the sale. Non suit was therefore properly ordered.

*Exceptions overruled.*