John MacVicar, Appellee, v. Western Asphalt Paving Corporation, Appellant.

**BROKERS: Compensation—Contract to Find Purchaser—Tentative Offer—Effect.** The issue whether a broker found a purchaser ready, able, and willing to buy the property of his principal is not affirmatively established by proof that the broker found one who made a tentative proposition to purchase, which was specifically dependent on a further investigation as to the legality and probable security of the property,—an issue of bonds,—which investigation the person making the offer never made.

Headnote 1: 9 C. J. pp. 604, 608.

*Appeal from Woodbury District Court.*—Robert H. Munger, Judge.

February 16, 1926.

Action to recover brokerage for finding purchaser for paving bonds. Verdict and judgment for plaintiff. Defendant appeals.—*Reversed.*

*Fred H. Schmidt* and *W. A. Helsell,* for appellant.

*Jepson, Struble, Anderson & Sifford,* for appellee.

Morling, J.—We find it necessary to discuss but one question: whether the plaintiff furnished a purchaser ready, able, and willing to consummate the transaction.

The action is to recover the amount of an agreed commission earned. While the petition alleges a sale, the case was tried and submitted to the jury, and is submitted to this court, only as one for the recovery of a commission for finding a purchaser, and not for a commission on a sale actually consummated. The purchaser claimed to have been found was the Equitable Life Insurance Company of Iowa. The bonds in question, with other bonds, were sold under a financing contract to F. C. Hubbell. Defendant had a contract for paving in Hawarden, on which it apparently had earned a bond issue of $80,000. Hubert Everist was defendant's manager. On July 22, 1920, he wrote a letter, Exhibit A, to S. D. Mangum, who was secretary of the Iowa Association of Municipal Contractors, to the effect that defendant would have this issue December 15th, and would offer the bonds at 92 cents. The letter also referred to the proposition of another person to advance $55,000 for financing another section of the work. Plaintiff was officing with Mangum. Mangum showed the letter to plaintiff. Plaintiff interviewed F. M. Hubbell and F. W. Hubbell, who were, respectively, chairman of the board and vice president and secretary of the Equitable Life Insurance Company. The presentment to the defendant of the Equitable Life Insurance Company and of its proposal to purchase relied upon by the plaintiff is in the form of a letter, Exhibit E, by the Equitable Life Insurance Company of Iowa to the defendant, August 5, 1920, as follows:

"Your favor of August 4th, with reference to the paving bonds to be issued by the City of Hawarden, has been received. Our understanding of your proposition is as follows: That you are to sell us on December 15, 1920, $80,000.00 of 6 per cent paving bonds, covering Section 2 of the Blue Print which you left at this office the bonds to be paid for at 92¢ on the dollar. This was the proposition offered to us by Mr. John MacVicar,

and we will accept the same subject to our approval of the legal status of the bonds and a satisfactory inspection of the benefited district. If this is the arrangement contemplated by you kindly advise us and we will arrange to have the district inspected within the very near future and then can enter into a definite contract for the purchase of the bonds, provided, of course, our inspection is satisfactory to us.

"Awaiting your reply, we remain,

"Very truly yours,

"Equitable Life Insurance Company of Iowa."

It will be noted that the company's alleged acceptance is stated to be "subject to our approval of the legal status of the bonds and a satisfactory inspection of the benefited district." It will be noted further that the Equitable Life Insurance Company referred the matter back to the defendant by this statement:

"If this is the arrangement contemplated by you kindly advise us and we will arrange to have the district inspected within the very near future and then can enter into a definite contract for the purchase of the bonds, provided, of course, our inspection is satisfactory to us."

This letter was written by F. W. Hubbell. As a witness for plaintiff, Mr. Hubbell testified that, following that correspondence:

"I did not make any investigation as to the records and proceedings in these bonds. Before I heard further from Mr. Everist, he practically withdrew the offer, and said he had made other plans. * * * These bonds were not purchased and never were purchased by me or through me from the Western Asphalt Paving Corporation for the Equitable Life Insurance Company of Iowa. * * * my father, F. C. Hubbell, entered into a contract with Mr. Everist to finance the work at Hawarden, and later purchased the bonds. * * * Q. At the time that letter was written by you, Mr. Hubbell, and mailed to Mr. Everist, and before any other or different arrangements were made, the Equitable Life Insurance Company of Iowa was ready, able, and willing to purchase the $80,000 bonds mentioned in that letter at 92 cents on the dollar, provided, of course, the legal status and the inspection of the district was satisfactory? A. Yes,

sir. * *. * The Equitable Life Insurance Company of Iowa cannot finance any job. * * * Q. As a matter of fact, you did not consider that you had entered into any contract to buy them? A. No, sir. We had only made an offer. That offer was never accepted by the defendants in this case, or any of them. * * * The fact is that neither I nor my company ever told anybody absolutely that the company would take these bonds at 92 cents on the dollar or any other sum. All that was ever said by me in that regard is contained in the letter marked Exhibit E. * * * I may have told Mr. MacVicar, subject to the approval of the district and the legal status of the proceedings, that I would take the bonds, but I cannot say definitely. * * * The investment committee [of the Equitable Life Insurance Company] agreed to take the bonds if they were satisfactory. * * * Before the Equitable Life Insurance Company would take any bonds, the legality of the bonds would have to be investigated by an attorney for the finance committee, and his approval obtained. This would have to be done, not only as to the proceedings, but as to the form. That never was done. * * * Nobody ever did go up to examine for the Equitable Life Insurance Company of Iowa in regard to these bonds on the Hawarden job, as far as I know. * * * Q. And while you didn't consider that as a binding contract, you did consider it, as you state in your deposition, as an offer on the part of the Equitable Life Insurance Company to take the $80,000 worth of bonds at 92 cents? A. Yes, sir.''

All street improvement bonds have the same form in the state of Iowa, practically, as far as witness knew. He said, ''That was so understood at the time.'' Plaintiff testified that he first talked with F. M. Hubbell; left him a memorandum. Later talked with F. W. Hubbell.

''On the next day after my interview with F. M. Hubbell, I called on him again, and he told me he had talked with F. W. Hubbell * * * and that the Equitable Life Insurance Company would take the $80,000 issue of bonds at 92 cents; that he could not take the $55,000 issue, for the reason that the money advanced was to carry on the work, and under the law the Equitable * * * was not permitted to advance money that way. * * * He repeated practically what F. M. Hubbell had said: that the Equitable Life Insurance Company of Iowa would take the

$80,000 worth of bonds at 92 cents, provided it was found satisfactory,—that their attorney found that the council's proceedings were regular.''

Plaintiff testified to a telephone conversation between Mangum and Everist, in which Mangum said to Everist:

'' 'We have some money for you;' and then he went on to say that he had found a purchaser for the $80,000 or more of bonds. · He also said that there would probably be a commission to pay. I did not hear what Everist said, but Mr. Mangum told me that he told him that he better come to Des Moines and complete the deal. He also told that the purchase was on the condition that everything was satisfactory and found to be regular. Before Mr. Everist came to Des Moines, I obtained a transcript or copies of the proceedings. * * * I had this transcript taken to the office of F. W. Hubbell.''

After this, Everist and plaintiff had their first communication, in which plaintiff says that Everist ''then agreed to pay a 2 per cent commission if I found a purchaser for the bonds.''

''I told him Mr. Hubbell agreed to take these bonds if the proceedings were found to be legal and regular. * * * Q. Previous to your seeing the Hubbells, as you have detailed, you had not had any conversation with Mr. Everist? A. No, sir. Q. You say that all you did in regard to selling these bonds you did before you ever saw Mr. Everist? A. Yes, sir. * * * Q. Up to that time, whatever you had done was done without any communication or agreement with Mr. Everist? A. Except the letter which Mr. Mangum showed me, Exhibit A. * * * In December, 1920, I knew the Equitable Life Insurance Company had not bought or financed the $55,000 worth of bonds. I swore to the first petition that I filed here in January, 1921. In that petition I claimed a commission on $135,000 worth of bonds. I knew that the Equitable Life Insurance Company would not take the $55,000 in bonds. * * * I did not take Mr. Everist over to the Equitable Life Insurance Company and introduce him to any of the officers.''

F. W. Hubbell made an investigation at Hawarden, and interviewed defendant at Sioux City. He testifies that he did not go there as an officer of the Equitable, to examine the proposition for the Equitable, and that nobody ever did, so far as he

knew.  The reason he didn't go was that Everist had turned down the offer contained in the letter of August 5, 1920.  Asked why the Equitable did not purchase the bonds, witness said:

"Because Mr. Everist made new arrangements; thought he could complete the work on Sections 2 and 3 if he could get someone to finance it, and the Equitable Life Insurance Company of Iowa does not do any financing of that character.  It can only purchase bonds that are legally issued."

He says there was no money necessary to be advanced on the $80,000 bond issue prior to their delivery.  They were ready for delivery without being financed.  He says:

"This transaction with the defendant and my father, F. C. Hubbell, was an independent and a valid contract, and he afterwards took the bonds in payment of the money which he had advanced to complete Sections 2 and 3 of the Hawarden paving."

F. W. Hubbell also testified that he handled the transaction for his father, F. C. Hubbell.

"Q.  In connection with this investigation and going to Hawarden and these deals with Mr. Everist, for whom did you consider you were acting?  A.  For Mr. F. C. Hubbell."

A contract dated August 12, 1920, was made between F. C. Hubbell and defendant, reciting that defendant had the paving contract with Hawarden, by the terms of which defendant was to receive cash, warrants, certificates, or bonds.  By this contract defendant agreed to sell to F. C. Hubbell all of the bonds which defendant should be entitled to, for face, less discount of 11 per cent.  F. C. Hubbell agreed to advance, as the work progressed, $100,000, on the statements of the city engineer, the money to be used to pay for labor and material in connection with the contract, and for no other purpose.  All bonds were assigned by defendant to F. C. Hubbell, as security for payment of the amounts advanced.

It is obvious that the negotiations with the Equitable Life Insurance Company were never carried to the point where that company stood in the attitude of offering to buy the bonds.  The company never inspected the district, never ascertained whether the district or the bonds were satisfactory, never expressed itself as approving of the bonds or of the district.  F. M. Hubbell,

F. C. Hubbell, and F. W. Hubbell were entirely distinct from the Equitable Life Insurance Company. The company was not they, and they were not the company. The inspection that was made was made for F. C. Hubbell, and for the purposes of a transaction that the Equitable Life Insurance Company could not enter into. The proposal set forth in Exhibit E was to have the district inspected, and then "enter into a definite contract for the purchase of the bonds; provided, of course, our inspection is satisfactory to us." It is elementary that, to entitle a broker to a commission for finding a purchaser, he must present either a valid obligation to buy, or must bring his employer and the proposed purchaser together, so that such a contract may be secured, if desired.

"The agent only finds the purchaser by being the means of furnishing him to the principal as a buyer, to whom the sale might have been made, but for the principal's perversity; and the cases cited by appellees go no further than to hold that such perversity—i. e., refusal to sell as proposed—will not defeat the right to recover the agent's commission, as stipulated. * * * Surely, a purchaser has not been found unless the agent has been the means of procuring a person who has either bound himself in writing to buy, and advised his principal of the fact, or who has indicated his readiness to consummate the purchase to the only person who can sell. * * * Until a buyer who has obligated himself to purchase, or is ready to do so, has been proffered in some way by the agent to his principal, the contract to find a purchaser has not been fulfilled." *Johnson Bros. v. Wright,* 124 Iowa 61.

See, also, *Beamer v. Stuber,* 164 Iowa 309; *Allgood v. Fahrney,* 164 Iowa 540; *Sanden & Huso v. Ausenhus,* 185 Iowa 389.

This action is not brought to recover damages for preventing the plaintiff from performing his contract. The action is to recover a commission earned by furnishing a purchaser ready, able, and willing. The letter of the Equitable Life Insurance Company was merely a conditional offer to purchase. It was not an unqualified acceptance of any offer made by the defendant which would result in effecting contractual relations. As a proposition on its part, a formal acceptance of it by defendant would not have resulted in a contract. There was no agreement

to purchase,—nothing but a tentative offer. *Batie v. Allison,* 77 Iowa 313; *Corcoran v. White,* 117 Ill. 118 (7 N. E. 525); *Navarre Realty Co. v. Coale,* 122 Md. 494 (89 Atl. 728); 1 Page on The Law of Contracts (2d Ed.), Section 74; *Coffin v. City of Portland,* 43 Fed. 411; *Bergmeier v. Eisenmenger,* 59 Minn. 175 (60 N. W. 1097); 13 Corpus Juris 281. The Equitable Life Insurance Company made its proposition subject not only to approval of the legality of the bond issue, but to an inspection of the benefited district. The inspection was doubtless required so that the officials of the company might determine for the company whether the cost of the improvement was reasonable in proportion to benefits; whether the assessments in their opinion would or would not be excessive; whether they would probably be paid, or would be open to possible default or repudiation. In short, the company's proposal was conditioned upon the security's being ascertained by itself to be satisfactory to itself. If the proposition had been to pay $80,000 for a farm, subject to satisfactory inspection, or to make a loan of $10,000 on a farm, subject to satisfactory inspection, it would scarcely be contended that there was any contract, or that a broker who had secured such a proposition would, on that alone, be entitled to a commission. It was not merely a matter of verification. It was a matter of looking into the investment, to determine whether it was wise or safe. *Hutchinson v. Plant,* 218 Mass. 148 (105 N. E. 1017); *Damers v. Trident Fisheries Co.,* 119 Me. 343 (111 Atl. 418); *Jordan v. McNally,* 124 Me. 216 (126 Atl. 876); *Anderson v. Preston* (C. C. A.), 7 Fed. (2d Series) 70. Further, it was the company's thought that they then (after inspection) could "enter into a definite contract."

The later negotiations between F. C. Hubbell and the defendant were for the purpose of accomplishing that which the Equitable Company could not do; were wholly independent of the previous negotiations for sale of the first bond issue. The investigation by F. W. Hubbell for F. C. Hubbell was not only for the purpose of a proposition of a different nature, and one in which the desirability of the bonds as an investment might not be so determinative, but by one who was not the Equitable Life Insurance Company, or acting for it, or, so far as shown, authorized to act for it. The acceptance of the bonds by F. C.

Hubbell was not an acceptance by the Equitable Life Insurance Company, nor even evidence that the Equitable Life Insurance Company would have accepted them. The proposal to buy $80,000 of bonds at 92 cents, as trustees, representing the policyholders, as well as the stockholders, of the life insurance company (even if F. C. and F. W. Hubbell were authorized to approve), was very different from one to purchase $135,000 at 89 cents on personal account, as a business venture in private financing. The "definite contract" which it was suggested might be made, was not made or offered.

The defendant moved for the direction of a verdict, on the ground, among others, that the plaintiff had failed to show that he had produced a purchaser in the Equitable Life Insurance Company, ready, able, and willing to take the bonds, without reservations, or had offered an enforcible contract to accept and take them at the price fixed. We think the motion should have been sustained.

The judgment is—*Reversed.*

DE GRAFF, C. J., and EVANS and ALBERT, JJ., concur.